**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC.; SHADOW SYSTEMS LLC; and BLUE TRAIL RANGE CORPORATION;<br><br>Plaintiffs,<br><br>v.<br><br>PATRICK J. GRIFFIN, in his official capacity as Chief State's Attorney; JOHN P. DOYLE, JR., in his official capacity as State's Attorney for the Judicial District of New Haven; MARGARET E. KELLEY, in her official capacity as State's Attorney for the Judicial District of Ansonia/Milford; JOSEPH T. CORRADINO, in his official capacity as State's Attorney for the Judicial District of Bridgeport; STACEY MIRANDA, in her official capacity as State's Attorney for the Judicial District of Danbury; SHARMESE L. WALCOTT, in her official capacity as State's Attorney for the Judicial District of Hartford; DAVID R. SHANNON, in his official capacity as State's Attorney for the Judicial District of Litchfield; MICHAEL A. GAILOR, in his official capacity as State's Attorney for the Judicial District of Middlesex; CHRISTIAN M. WATSON, in his official capacity as State's Attorney for the Judicial District of New Britain; PAUL J. NARDUCCI, in his official capacity as State's Attorney for the Judicial District of New London; CRAIG P. NOWAK, in his official capacity as State's Attorney for the Judicial District of Tolland; MAUREEN PLATT, in her official capacity as State's Attorney for the Judicial District of Waterbury; and JOHN F. FAHEY, in his official capacity as State's Attorney for the Judicial District of Windham;<br><br>Defendants. | Civil Action No. __________<br><br>September 21, 2026 |

**VERIFIED COMPLAINT**

The National Shooting Sports Foundation, Inc. ("NSSF"), Shadow Systems LLC, and Blue Trail Range Corporation bring this civil action seeking declaratory and injunctive relief against the Chief State's Attorney of Connecticut and the State's Attorney for each Judicial District.

**INTRODUCTION**

1. Semiautomatic handguns "are, in fact, 'the quintessential self-defense weapon.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)). And semiautomatic handguns equipped with cruciform trigger bars are, in fact, the quintessential handgun. Pioneered by Austrian inventor Gaston Glock in the 1980s, the cruciform-trigger design revolutionized the handgun market on both sides of the Atlantic: By integrating multiple firearm components into a single part, the cruciform-trigger design resulted in a handgun that is less expensive to produce, easier to maintain, less susceptible to component failure or debris infiltration, and—critically—less likely to accidentally discharge. *See* Elwood Shelton, *Best Concealed Carry Guns in 2026 [Field Tested]*, Gun Digest (May 22, 2026), https://perma.cc/39AJ-W396 (describing cruciform-trigger handguns as "almost boringly reliable" "thanks to a painfully simplistic design that offers few opportunities for malfunctions to occur"). That explains why, once Glock's patents expired, manufacturers like plaintiff Shadow Systems LLC began producing and selling their own cruciform-trigger handguns using the same basic design. It also explains why, for retailers like plaintiff Blue Trail Range Corporation, selling cruciform-trigger handguns to law-abiding citizens is big business: Every year, hundreds of thousands of these common arms are made in the United States and sold not just to law-abiding civilians seeking to use them for self-defense, but also to law enforcement officers, including (since 2022) every Connecticut State Trooper.

2. Although they are overwhelmingly used for lawful purposes, these handguns may,

like "virtually any semiautomatic weapon," unlawfully "be converted … by internal modification … into a machinegun" capable of full-automatic functionality—i.e., continuously firing rounds for as long as the trigger is actuated, instead of the standard one-round-per-trigger-pull. *Staples v. United States*, 511 U.S. 600, 615 (1994). That has understandably led the federal government and many states, including Connecticut, to criminalize possession of handguns that have been modified in that manner, as well as the aftermarket conversion devices—commonly known as pistol "switches"—that criminals use to accomplish the modification. But despite the omnipresent potential for illegal modification to an automatic firearm, the Supreme Court has been unequivocal that the underlying semiautomatic firearms remain "lawful" to "possess[]." *Id.* at 612. That is because "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" full stop. *Bruen*, 597 U.S. at 21. Efforts to ban "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose"—such as cruciform-trigger handguns—thus "[f]ail constitutional muster" under "any" "standard." *Heller*, 554 U.S. at 628-29.

3. A new Connecticut law flouts those principles and precedents. Starting October 1, Substitute House Bill No. 5043 ("HB5043") makes it a felony to sell any of the market-leading cruciform-trigger handguns. Never mind if law-abiding Connecticut residents with a concealed-carry permit want to buy one of *Gun Digest*'s best concealed-carry guns of 2026. *See* Shelton, *supra*. Never mind if law-abiding Connecticut residents seeking to engage in recreational target shooting want to buy one of the top five best-selling handguns. *See* Palmetto State Armory, *Top 5 Best-Selling Handguns of 2026 (So Far)*, https://perma.cc/2N35-4GB2 (describing cruciform-trigger handguns as "prolific," "unsurpassed," and "the perfect balance of precision and reliability"). Never mind that, last year alone, sales of cruciform-trigger handguns generated tens

of millions of dollars in revenue for manufacturers like Shadow Systems, and tens of thousands of dollars in revenue for retailers like Blue Trail Range. After October 1, Connecticut retailers must remove all new cruciform-trigger handguns from their shelves or subject their principals to five years in prison, unless and until manufacturers change a design that law-abiding citizens overwhelmingly prefer for its safety, reliability, and accessibility.

4. That law lacks any historical analogue—and the logic underlying it lacks any limit. If Connecticut can ban cruciform-trigger handguns because of the risk that criminals can convert them into fully automatic machine guns, then it could ban "virtually any semiautomatic weapon" for the same reason, *Staples*, 511 U.S. at 615, even though semiautomatic weapons are "the weapons most commonly used today for self-defense," *Caetano v. Massachusetts*, 577 U.S. 411, 417-18 (2016) (Alito, J., concurring in the judgment). *Accord Snope v. Brown*, 145 S.Ct. 1534, 1534 (2025) (Kavanaugh, J., respecting the denial of certiorari) (noting that "most handguns" today "are semi-automatic"). And it does not stop with semiautomatic weapons. If Connecticut can ban cruciform-trigger handguns because criminals can use household tools to modify them into uncommon and unlawful guns, then Connecticut could ban hunting rifles and shotguns for the same reason: Criminals have been using hacksaws to turn them into illegal short-barreled firearms since long before the days of Bonnie and Clyde. In short, if Connecticut can ban cruciform-trigger handguns because of the sheer potential to convert them into something illegal, then it is hard to see what class of firearm it could not ban.

5. None of that is consistent with the Second Amendment. To be sure, states have broad authority to regulate "dangerous and unusual weapons," *Heller*, 554 U.S. at 627, which is why they may ban the relatively small number of handguns that have been unlawfully converted into fully automatic firearms. But if a firearm is "in common use at the time," then it is plainly

not "highly unusual in society at large." *Bruen*, 597 U.S. at 47. And the mere fact that a firearm that is typically possessed by law-abiding citizens for lawful purposes can be altered to become dangerous and unusual does not make the *unaltered* firearm less commonly used for lawful purposes. It has always been easy for landowners to convert common firearms into dangerous and unusual booby traps to ambush intruders, or for criminals to saw off the barrels of common shotguns to turn them into illegal short-barreled firearms. But our Nation's tradition has always been one of criminalizing the modification and prosecuting the modifiers, not taking the unmodified firearm away from those who seek to keep and bear it for lawful purposes. That was true at the Founding, and it remains true today. *Compare, e.g.*, 1771 N.J. Laws 346, §10 (prohibiting the "most dangerous" practice of setting guns to discharge by "string, rope or other contrivance" and requiring "such person or persons [to] forfeit and [either] pay the sum of six pounds" or "be committed to the common gaol of the county[] for six months"), *with, e.g.*, 21 U.S.C. §841(d) (similar).

6. Just so here. Connecticut may ban the parts used to interfere with cruciform-trigger handgun's intended semiautomatic functioning. (In fact, it already has. *See* Conn. Gen. Stat. §53-206g.) It may aggressively prosecute both those who do the illicit modifying and those who supply the illicit parts to aid it. And it may mobilize all manner of resources to educate the public about this important public-safety issue. But it cannot drive "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose" off the market. *Heller*, 554 U.S. at 628. *Heller* was clear: It is not "permissible to ban the possession of handguns so long as the possession of other firearms … is allowed." *Id.* at 629.

7. HB5043 is incompatible with our Nation's historical tradition of firearm regulation. The Court should declare it unconstitutional and enter an order preliminarily and permanently

enjoining its implementation and enforcement.

**PARTIES**

8. Plaintiff **NSSF** is a non-profit, tax-exempt, non-stock corporation with its principal place of business in Shelton, Connecticut. It serves as the leading trade association for the firearm, ammunition, and hunting and shooting sports industries, with a membership of approximately 10,000 that includes manufacturers, distributors, and retailers of firearms, ammunition, and related products, including manufacturers, distributors, and retailers based in Connecticut. NSSF's mission is to promote, protect, and preserve hunting and shooting sports by addressing industry challenges; to advance participation in and understanding of hunting and shooting sports; to reaffirm and strengthen its members' commitment to the safe and responsible sale and use of their products; and to promote support for America's traditional hunting and shooting heritage and firearm freedoms.

9. NSSF is also a committed law-enforcement partner. For decades, it has collaborated with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on an anti-straw-purchasing campaign known as "Don't Lie for the Other Guy." *See NSSF, ATF Celebrate 25 Years of Partnership*, NSSF (Sept. 15, 2025), https://perma.cc/WYS9-FYN8. It also partners with ATF to deter and prevent "smash-and-grab" burglaries and robberies of firearm retailers through a program known as "Operation Secure Store." *See Operation Secure Store*, NSSF (2026), https://perma.cc/ZV4A-3PKF. And in response to "increasing numbers of illegal [machinegun conversion devices] recovered at crime scenes," NSSF has launched and devoted money, manpower, and other resources to its "Right Side of Legal" educational campaign, warning firearm owners that "[m]odifying a firearm by adding an illegal device that overrides the original, intended function or design to render a semiautomatic firearm into an automatic firearm is a felony." *See Right Side of Legal*, NSSF (2026), https://perma.cc/D4RU-BPRR ("Illegally modify

a gun, face the time: Full auto means full consequences.").

10. Shadow Systems and Blue Trail Range are both NSSF members. NSSF's membership also includes several other manufacturers who specialize in manufacturing and designing cruciform-trigger handguns. In addition to Shadow Systems, these members include Glock, Derya, Ruger, Palmetto State Armory, and Beretta (including through its affiliate Stoeger). All of these manufacturers make and sell a substantial number of cruciform-trigger handguns annually, including to customers in Connecticut as well as nationwide.

11. Plaintiff **Shadow Systems** is one of the leading U.S. producers of 9mm cruciform-trigger handguns. Founded in 2016, Shadow Systems quickly grew from a small start-up into a nationally distributed firearms manufacturer led by a West Point graduate with its own state-of-the-art facility in Plano, Texas featuring proprietary (and reliability-enhancing) manufacturing technology—making it one of the few manufacturers to offer a fully made-in-America firearm with unparalleled quality. Its commitment to delivering the most price-competitive, highest-value pistols and parts on the market has led it to become a leading supplier of self-defense and recreational handguns to law-abiding citizens, as well as a supplier to over 350 law-enforcement agencies. Although cruciform-trigger handguns comprise Shadow Systems' original, best-known, and most commercially successful product line by a significant margin, the business has recently expanded into rifles, optics, and other related products.

12. From 2021 through last month, Shadow Systems has shipped over $204 million of product to retailers nationwide—the overwhelming majority of which is cruciform-trigger handguns. Over the same period, it has sold over $530,000 of cruciform-trigger handguns into Connecticut, averaging over $100,000 of Connecticut sales annually.

13. Laws banning cruciform-trigger handguns represent an existential threat to Shadow

Systems' business. One of the only analogs for HB5043 is a 2025 California law that likewise sought to ban most new cruciform-trigger handguns—though to California's minimal credit, its law did not sweep nearly as far as HB5043. *Cf.* Cal. Penal Code §27595(a) (citing Cal. Penal Code §16885). Nonetheless California's law was enough to drive Shadow Systems from the Golden State entirely—a loss of nearly $3.8 million of annual revenue, and 11% of Shadow System's overall business.

14. Plaintiff **Blue Trail Range** is one of New England's best known and best regarded firearm facilities. *See, e.g.*, *Blue Trail Range Receives NSSF Four-Star Range Rating*, NSSF (June 14, 2023), https://perma.cc/3KUT-F8HW. Founded in 1945 as an offshoot of a World-War-II-era optics manufacturer, Blue Trail Range has been owned and operated by the Lyman family for over eight decades; its day-to-day operations are overseen by a retired Connecticut Conservation Enforcement Officer who also served as an adjunct instructor at the Connecticut Police Academy. Blue Trail Range's Wallingford facility boasts the only public outdoor shooting range in the area, as well as an indoor shooting range, retail firearm store, state-of-the-art training center, and event space. That facility serves as the practice venue for multiple area high-school rifle teams, as well as the competition venue for the Connecticut high school state rifle championship and rifle events in the Nutmeg State Games. Blue Trail Range also routinely offers pistol and long-gun permit classes, self-defense training, and firearms-safety courses for adults and juniors alike. In addition to those training courses, Blue Trail Range hosts various recreational leagues designed to safely introduce Connecticut residents of all ages to the shooting sports. Blue Trail Range is an active member of both the Better Business Bureau and the Connecticut Business & Industry Association, as well as a 2025 recipient of the Quinnipiac Chamber of Commerce's small business award.

15. Blue Trail Range is also a committed law-enforcement partner. Once a year, it

invites ATF to put on training sessions for its retail staff to improve vetting of customers. As an NSSF member, Blue Trail Range also participates in NSSF's "Don't Lie for the Other Guy" initiative to combat illegal straw purchasing, as well as NSSF's biennial safe firearm storage initiative. And it frequently sells firearms, ammunition, and accessories to various law-enforcement officers for on- and off-duty use.

16. As a retailer, Blue Trail Range is committed to doing business in an ethical and professional manner. Its employees are instructed to get to know their customers and to ensure that they are selling the right guns to the right people—especially when they know or suspect that a customer is buying his or her first firearm. This practice includes asking the customer about his/her intended use of the firearm, reviewing basic firearm safety, and going over proper firearm use, from loading and unloading to disassembly and cleaning. Blue Trail Range also routinely recommends that customers take a firearms safety course for further safety instruction and skill development. During these conversations, Blue Trail Range is not only getting to know its customers, but also evaluating their maturity and state of mind (and/or whether they are potential straw purchasers). And at the risk of stating the obvious, Blue Trail Range never sells a firearm to a customer without conducting any and every background check required by law.

17. A substantial portion of Blue Trail Range's retail business comprises sales of cruciform-trigger handguns and related accessories. In each of the past three years, Blue Trail Range has sold on average roughly 10 cruciform-trigger handguns made by Shadow Systems.

18. Defendant **Patrick J. Griffin** is Connecticut's Chief State's Attorney. As Chief State's Attorney and head of the Division of Criminal Justice, Griffin is "in charge of the investigation and prosecution of all criminal matters." Conn. Const., art. IV, §27; *see* Conn. Gen. Stat. §51-277. Griffin is a resident of Connecticut, and his principal place of business is in Rocky

Hill. At all relevant times, Defendant Griffin, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Griffin in his official capacity.

19. Defendant **John P. Doyle, Jr.** is the State's Attorney for the New Haven Judicial District, which encompasses Wallingford. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Doyle is a resident of Connecticut, and his principal place of business is in New Haven. At all relevant times, Defendant Doyle, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Doyle in his official capacity.

20. Defendant **Margaret E. Kelley** is the State's Attorney for the Ansonia/Milford Judicial District. As State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Kelley is a resident of Connecticut, and her principal place of business is in Ansonia/Milford. At all relevant times, Defendant Kelley, as well as those subject to her supervision, direction, or control, act under color of state law. Plaintiffs sue Kelley in her official capacity.

21. Defendant **Joseph T. Corradino** is the State's Attorney for the Bridgeport Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Corradino is a resident of Connecticut, and his principal place of business is in Bridgeport. At all relevant times, Defendant Corradino, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Corradino in his official capacity.

22. Defendant **Stacey Miranda** is the State's Attorney for the Danbury Judicial District. As State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Miranda is a resident of Connecticut, and her principal place of business is in Danbury. At all relevant times, Defendant Miranda, as well as those subject to her supervision, direction, or control, act under color of state law. Plaintiffs sue Miranda in her official capacity.

23. Defendant **Sharmese L. Walcott** is the State's Attorney for the Hartford Judicial District. As State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Walcott is a resident of Connecticut, and her principal place of business is in Hartford. At all relevant times, Defendant Walcott, as well as those subject to her supervision, direction, or control, act under color of state law. Plaintiffs sue Walcott in her official capacity.

24. Defendant **David R. Shannon** is the State's Attorney for the Litchfield Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Shannon is a resident of Connecticut, and his principal place of business is in Litchfield. At all relevant times, Defendant Shannon, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Shannon in his official capacity.

25. Defendant **Michael A. Gailor** is the State's Attorney for the Middlesex Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate

presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Gailor is a resident of Connecticut, and his principal place of business is in Middlesex. At all relevant times, Defendant Gailor, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Gailor in his official capacity.

26. Defendant **Christian M. Watson** is the State's Attorney for the New Britain Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Watson is a resident of Connecticut, and his principal place of business is in New Britain. At all relevant times, Defendant Watson, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Watson in his official capacity.

27. Defendant **Paul J. Narducci** is the State's Attorney for the New London Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Narducci is a resident of Connecticut, and his principal place of business is in New London. At all relevant times, Defendant Narducci, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Narducci in his official capacity.

28. Defendant **Craig P. Nowak** is the State's Attorney for the Tolland Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Nowak is a resident of Connecticut, and

his principal place of business is in Tollan. At all relevant times, Defendant Nowak, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Nowak in his official capacity.

29. Defendant **Maureen Platt** is the State's Attorney for the Waterbury Judicial District. As State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Platt is a resident of Connecticut, and her principal place of business is in Waterbury. At all relevant times, Defendant Platt, as well as those subject to her supervision, direction, or control, act under color of state law. Plaintiffs sue Platt in her official capacity.

30. Defendant **John F. Fahey** is the State's Attorney for the Windham Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Fahey is a resident of Connecticut, and his principal place of business is in Windham. At all relevant times, Defendant Fahey, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Fahey in his official capacity.

**JURISDICTION AND VENUE**

31. This Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343 because Plaintiffs allege that HB5043 violates the U.S. Constitution and seek relief under 42 U.S.C. §1983.

32. Venue is proper in this District under 28 U.S.C. §1391 because Defendants reside here as a matter of law, and because a substantial part of the events or omissions giving rise to the claim occurred here.

## BACKGROUND

### I. Cruciform-Trigger Handguns Are "America's Gun."

33. It is hard to overstate the impact that Austrian inventor Gaston Glock had on the handgun market when he unveiled the cruciform-trigger design in 1982. As one rival manufacturer put it, Glock's design "became the next generation of how the entire world makes handguns": "Every single manufacturer from the pre-Glock era now makes a post-Glock era [cruciform-trigger] handgun." Frank Koppenhagen et al., *The Genesis of the Glock Pistol: How Gaston Glock Created the Dominant Design for Handguns* 1-2 (2025), https://perma.cc/7YEJ-YJTQ.

34. Although Glock had no training in firearm design, he was able to resolve a contradiction that had confounded other manufacturers: how to "combin[e] the firepower and rapid reload capability of" many "semiautomatic pistols" with "the safety and operational simplicity of" the leading "double-action revolvers" of the day. *Id.* at 2, 5, 24-25; *see also* CBS News, *How Glock Became America's Gun* (Sept. 15, 2013), https://perma.cc/6EXT-YBH6 [hereinafter *America's Gun*]. At the time, double-action revolvers—so-named because a single pull of the trigger both cocks and releases the firearm's hammer—typically held only six cartridges, took significant time to reload, and had "a long, heavy trigger pull" that was a mixed blessing: It "ma[d]e[] it virtually impossible to accidentally discharge the gun," but also "ma[d]e[] rapid and precise shooting more challenging" in self-defense situations. Koppenhagen et al., *supra*, at 5-6. By contrast, the then-predominant semiautomatic pistols used a "double-action/single-action" design: "The first shot, fired in double-action mode, require[d] a longer and heavier trigger pull, as the trigger must both cock and release the hammer. All subsequent shots [we]re fired in single-action mode," with "a shorter and lighter trigger pull." *Id.* at 6. Although those double-action/single-action semiautomatic pistols held significantly more cartridges than double-action revolvers, the "transition between different trigger pull weights" "negatively

impact[ed] accuracy and shot consistency," and the design "required" "additional operating steps" that "complicate[d] the safe operation of the gun and pose[d] potential sources of operating errors, particularly in high stress conditions." *Id.*

35. Glock's revolutionary design resulted in "a pistol that, once chambered, remains both ready to fire and safe to carry at all times, with a consistent trigger pull optimized for both safety and performance." *Id.* at 5. The key innovation was the so-called cruciform "trigger bar capable of movement in two non-parallel directions," a capability that enables it to "perform[] three functions that were traditionally carried out by separate components" in prior handgun designs. *Id.* at 9, 12; *see also id.* at 13-17 (explaining the more technical aspects of the mechanics); Matt Rittman, *How a Glock Works* (July 2, 2019), https://bit.ly/4wHWaOi. Because the cruciform design allows for "stamp[ing]" instead of "machin[ing]," it is also more "cost-effective" to "mass produc[e]." Koppenhagen et al., *supra*, at 20-21. As Glock put it in his original U.S. patent:

> Handling of the pistol according to the instant invention is therefore as simple as possible. The pistol is ready after chambering of the cartridge in the barrel for shooting at any time and is nonetheless completely safe from unintentional shots. Similarly in this condition the pistol is fully drop- and jar-resistant. As a result of the unchanging trigger force accuracy is increased. Simple and safe handling of the pistol is ensured even for the unpracticed user.

*Id.* at 9; *see id.* at 18 (schematic comparing operational steps for Glock versus other common firearm design). And with "significantly fewer parts" "than all competing products at the time," the cruciform-trigger pistol is "significantly simpl[er]" to maintain" and "demonstrate[d] … significantly higher" "reliability." *Id.* at 21; *see also* CBS, *America's Gun* (observing that cruciform-trigger handguns have "only 34 components—about half of most other makers," "ma[king] the gun easier to manufacture, and less likely to malfunction").

36. The cruciform-trigger design also allows for three sequential passive safeties, each operating independently—a groundbreaking advancement when it comes to preventing accidental

discharges:




GLOCK, *Our Safe Action® System* (2026), https://perma.cc/4GZG-DPMQ (red annotation added). *First*, a safety lever integrated into the trigger blocks unintentional "rearward movement of the trigger":




Koppenhagen et al., *supra*, at 13-15. *Second*, the design of the cruciform trigger bar makes it physically impossible for the firing pin to strike the cartridge unless and until the shooter actuates the cruciform trigger bar by pulling the trigger:




*Id.* at 15. *Third*, the design of the cruciform-trigger bar makes it impossible for the firing pin to release without the shooter actuating the cruciform trigger bar:




*Id.* at 14. *See generally* Rittman, *supra*. The cruciform trigger bar's innovative design is what makes it possible to combine these redundant safeties into one integrated component, rather than relying on multiple subcomponents to work together in ways that make the firearm more susceptible to component failure or manufacturing defects.

37. That "unique balance" of safety, "performance[,] and value" has made cruciform-trigger handguns "wide[ly] popular[]" for countless "armed citizens, competition shooters, collectors, and general firearms enthusiasts." Kyle Clouse, *Is Glock Still the King of Semi-Auto Pistols?*, Liberty Safe (Jun. 13, 2025) https://perma.cc/TV8E-HZJ7; *see also* CBS, *America's Gun*

(deeming cruciform-trigger handguns "a lawnmower as far as reliability goes"). Firearms produced by Glock's eponymous company alone have consistently accounted for up to "65% market share of the handguns in the U.S." Forbes, *Gaston Glock & Family* (2026), https://perma.cc/AV67-93M4; *see* Clouse, *supra* ("[M]ore Glock pistols have been sold than any other handgun ever made, with recent estimates numbering total Glock sales topping the 20 million mark globally."). And now that the patent on Glock's cruciform-trigger bar has expired, an entire industry of manufacturers has cropped up "mak[ing] their own versions of Glock pistols," Clouse, *supra*, i.e., their own version of cruciform-trigger pistols.

38. When it comes to so-called "Glock clone" manufacturers, Shadow Systems "is certainly one of the best in its class." Brad Fitzpatrick, *Top Glock Clones U.S. Buyers Are Raving About* (Mar. 12, 2026), https://perma.cc/4V65-Y6Y4 (listing, among others, the Shadow Systems MR920, and noting that Shadow Systems "produces some of the best handguns on the market" with "a lot of great features" making them both "well designed and rugged" as well as "extremely accurate and ultra reliable"); *see also* Paul Peterson, *7 Best Glock Clones for Any Budget: Buyer's Guide*, Guns.Com (Feb. 20, 2025), https://perma.cc/DK5C-NN2U (identifying Shadow Systems as manufacturing "a family of premium Glock clones" "all carry[ing] a Glock's basic DNA but with some serious genetic modifications" that "pa[y] particular attention to how a shooter's hand engages with the" pistol). As those market-leading reviews suggest, Shadow Systems guns are popular with, and commonly used by, law-abiding citizens both in and out of Connecticut, as both its and Blue Trail Range's sales figures corroborate. *See supra* ¶¶12, 17.

39. As a class, well over 500,000 cruciform-trigger handguns are manufactured for sale in the United States annually. *See, e.g.*, ATF, *Annual Firearms Manufacturing & Export Report* 15, 51, 201-02 (2024), https://perma.cc/ZCU6-WWR2. By any measure, and as the federal

government has acknowledged across multiple administrations, cruciform-trigger handguns are "popular for civilian use." 87 Fed. Reg. 24,652, 24,655 (Apr. 26, 2022); *see also Bianchi v. Brown*, 111 F.4th 438, 455 (4th Cir. 2024) (en banc) (referring to a cruciform-trigger handgun as a "commonly used handgun"); *id.* at 527 (Richardson, J., dissenting) (similar).

40. While safety, reliability, and affordability help explain why cruciform-trigger handguns have become the handgun of choice for law-abiding citizens, they are decidedly *not* the firearm of choice for criminals. Quite the contrary: ATF data tracking "weapons recovered at crime scenes" dispels any suggestion that cruciform-trigger handguns are "distinctively used" by criminals "more than other guns." CBS, *America's Gun* ("The notion that every gangster in every city is walking around with a Glock just isn't true.").

41. That said, "one of the most prominent emerging public and law enforcement officer safety threats in recent years has been the proliferation of illegal" machine gun conversion devices ("MCD"). *Right Side of Legal*, *supra*. "MCDs include traditional 'Drop in Auto Sears,' which are designed for use on AR-type firearms," *id.*—i.e., "the most popular rifle in the country" among law-abiding citizens, *Smith & Wesson Brands v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025). MCDs also include "more recently developed 'switches,' which are designed for use on" cruciform-trigger handguns. *Right Side of Legal*, *supra*; *see* ATF, *Machinegun Conversion Devices: Fact Sheet* (Dec. 12, 2024), https://perma.cc/LD8J-GRB4.

## II. HB5043 Bans Sales Of New Common Cruciform-Trigger Handguns After October 1.

42. For decades, lawmakers have responded to the threat of MCDs by criminalizing the MCDs themselves, as well as firearms equipped with them. Federal law, for instance, criminalizes "machinegun" possession, *see* 18 U.S.C. §922(o), and defines "machinegun" as "any" fully automatic weapon, as well as "any part designed and intended … for use in converting a weapon into a machinegun," 26 U.S.C. §5845. Section 53-206g of the Connecticut General Statutes

likewise criminalizes possession of any "rate of fire enhancement," which is defined to include "any device, component, part, combination of parts, attachment or accessory that … causes a semiautomatic firearm to fire more than one round per operation of the trigger."

43. But as the Supreme Court noted in *Staples v. United States*—itself a case about an illegally modified, fully automatic AR-15—unmodified semiautomatic firearms have always remained "lawful" to "possess[]." 511 U.S. at 612.

44. HB5043 breaks that unbroken tradition "by prohibiting the future sale of new [cruciform-trigger] handguns." Statement of Governor Ned Lamont, *Testimony For Bill Number HB-05043 In All Committees*, https://perma.cc/9RNV-9WUF. Effective October 1, 2026, HB5043 makes it "a class D felony" for "[a]ny individual or firm, partnership, corporation, limited liability company, association or other similar entity" to "knowingly import[] into this state or knowingly advertise[], sell[], offer[] or expose[] for sale any convertible pistol … manufactured on or after October 1, 2026." A class D felony is punishable by up to five years imprisonment and a fine of up to $5,000. Conn. Gen. Stat. §§53a-35a(8), 53a-41(4). A copy of HB5043 is attached as Exhibit A.[1]

45. HB5043 defines "convertible pistol" as "any semiautomatic pistol with a cruciform trigger bar that can be readily altered by hand or with a common household tool so that the pistol can be readily converted into a machine gun by the installation or attachment of a pistol converter." Ex.A at 2. A pistol converter is in turn defined as "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, interferes with the trigger mechanism, thereby enabling the pistol to discharge a number of shots or bullets rapidly or

[1] HB5043 also amends the definition of "machine gun" in §53-202(a) so that it "includ[es] any convertible pistol that is equipped with a pistol converter." Ex.A at 1. Plaintiffs do not challenge this aspect of HB5043.

automatically with one continuous pull of the trigger." Ex.A at 3.

46. The only way for a cruciform-trigger handgun to fall outside HB5043's definition of "convertible pistol" is if it "has a tab or other piece of material molded to the pistol's frame" that cannot "be readily removed" and "that shields the cruciform trigger bar from … a pistol converter." Ex.A at 2. None of the popular cruciform-trigger handguns currently made by Shadow Systems has this feature.

47. Changing the well-known cruciform-trigger design to conform to Connecticut's preferences would cost Shadow Systems substantial time and money. And there is no guarantee that law-abiding consumers who have come to overwhelmingly prefer the current cruciform-trigger design owing to its decades-earned reputation of safety and reliability will be enthusiastic about switching to an alternative. Nor is there any guarantee, even if manufacturers' investment in developing a commercially viable alternative pays off, that Connecticut will not amend HB5043 to ban that handgun next. At bottom, no amount of design alteration can ever make a handgun impervious to criminal misuse, or change the reality that "virtually any semiautomatic weapon may be converted" "into a machinegun" by someone set on committing that crime. *Staples*, 511 U.S. at 615. The same (il)logic underlying HB5043 thus could be invoked to ban semiautomatic firearms entirely.

## III. Banning Sales Of Guns In Common Used For Lawful Purposes Is Inconsistent With Historical Tradition And Therefore Violates The Second Amendment.

48. The Supreme Court has held multiple times that states may not ban arms that "law-abiding citizens" "typically possess[] … for lawful purposes." *Heller*, 554 U.S. at 625, *accord Bruen*, 597 U.S. at 21 ("[T]he Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"). That describes HB5043 to a T: In purpose and effect, it is designed to "eliminat[e] the ability of law-abiding, responsible citizens to acquire" the single most

common class of handguns—indeed, one of the most common firearms—on the market. *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) (per curiam) (holding that "commercial regulations on firearms dealers, whose services are necessary to a citizen's effective exercise of Second Amendment rights, cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms"); *see* Statement of Governor Ned Lamont, *supra*.

49. Whatever room for debate there may be about what exactly suffices to render a class of firearms in common use, there can be no serious dispute that cruciform-trigger handguns are typically possessed by a substantial number of law-abiding citizens for self-defense, both inside and outside Connecticut. That makes HB5043 unconstitutional, full stop. When it comes to what "Arms" "the people" have a "right" "to keep and bear," U.S. Const. amend. II, common use *is* the controlling test—and HB5043 flunks it.

50. That these ubiquitous semiautomatic handguns can be converted into fully automatic firearms does not change the calculus. Modern firearm restrictions are permissible only if they are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. And for as long as firearms have existed, criminals unfortunately have attempted dangerous firearm conversions. Yet HB5043's response to that age-old problem departs starkly from the traditional way our Nation has dealt with that problem—which is by banning the conversion, not the convertible firearm.

51. For instance, criminals have always been able to convert common firearms into dangerous and unusual booby traps. The tradition at the Founding was to criminalize these so-called trap guns but to leave the unmodified gun legal to purchase and possess. *See, e.g.*, 1771 N.J. Laws 346, §10. That remained the tradition when the states ratified the Fourteenth Amendment. *See, e.g.*, 1884 Vt. Acts & Resolves 74, §1. And it remains the tradition today. *See,*

*e.g.*, 21 U.S.C. §841(d).

52. Criminals have likewise always been able to convert long guns commonly used for hunting and other lawful purposes into illegal short-barreled rifles and shotguns. But here, too, the unbroken tradition has been to criminalize the sawed-off variants (and prosecute those doing the sawing) but leave the unmodified rifles and shotguns lawful to purchase and possess. *See, e.g.*, 18 U.S.C. §922(a)(4), (b)(4); Conn. Gen. Stat. §53a-211.

53. More recently, criminals have devised no shortage of ways to turn common semiautomatic arms into illegal machine guns, from "fil[ing] away" internal safeguards (as in *Staples*, 511 U.S. at 603) to simply tying a shoelace "to the cocking handle of a semiautomatic rifle" (as described in, *e.g.*, Letter from Richard Vasquez, Acting Chief, Firearms Technology Branch, ATF, to Brian A. Blakely (June 25, 2007), https://perma.cc/22Q7-7C94). Once again, the modern response reflects the Founding-era tradition: ban the modification and the modified firearm, but leave the unmodified firearm legal to purchase and possess.

54. Indeed, the history is so one-sided that Plaintiffs would prevail even if they bore the burden to prove that HB5043 is *not* consistent with historical tradition, *contra Bruen*, 597 U.S. at 24. The potential for dangerous firearms conversions has always been an unfortunate byproduct of widespread firearm availability, and it was a potential well known to the Founding generation. Yet that generation chose to ratify the Second Amendment regardless—"the very *product* of an interest balancing by the people" that "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at 26. It is not for Connecticut to "conduct" that balancing "anew" today. *Heller*, 554 U.S. at 635.

## CLAIM FOR RELIEF

### Violation of U.S. Constitution, Second Amendment
### 42 U.S.C. §1983

55. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set out herein.

56. The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

57. As relevant here, HB5043 defines "convertible pistols" as "any semiautomatic pistol with a cruciform trigger bar that can be readily altered by hand or with a common household tool so that the pistol can be readily converted into a machine gun by the installation or attachment of a pistol converter." Ex.A at 2. HB5043 defines "machine gun" in principal part as "a weapon of any description, loaded or unloaded, … that shoots, is designed to shoot or can be readily restored to shoot automatically more than one projectile, without manual reloading, by a single function of the trigger." Ex.A at 1. HB5043 defines "pistol converter" as "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, interferes with the trigger mechanism, thereby enabling the pistol to discharge a number of shots or bullets rapidly or automatically with one continuous pull of the trigger." Ex.A at 3.

58. So defined, "convertible pistols" are "Arms" covered by the Second Amendment.

59. So defined, "convertible pistols" are in common use for self-defense, hunting, target shooting, and other lawful purposes.

60. Because HB5043 bans the commercial sales of arms in common use for lawful purposes, it violates the Second Amendment. *See Gazzola*, 88 F.4th at 195-96 ("A State cannot circumvent [the Second Amendment] by banning outright the sale or transfer of common-use weapons and necessary ammunition.").

61. Shadow Systems and other NSSF members have long been manufacturing handguns that HB5043 bans; Blue Trail Range and other NSSF members have long been selling them; all would like to continue to engage in that presently lawful conduct. And the customers that Shadow Systems, Blue Trail Range, and other NSSF members would like to continue to be able to lawfully serve are among "the people" the Second Amendment protects.

62. NSSF, Shadow Systems, and Blue Trail Range therefore have standing to challenge HB5043, both in their own right and on behalf of those members and customers. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *Knight v. City of New York*, 164 F.4th 173, 177-79 (2d Cir. 2026) (per curiam); *Gazzola*, 88 F.4th at 194 (having "no trouble concluding that" "purveyors of firearms" can "resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market."); *Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) ("Either" an organization "can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'"). Among other things, if HB5043 is permitted to take effect, NSSF will be forced to divert resources away from other initiatives—including the "Right Side of Legal" campaign described *supra* ¶9—and devote significant resources to educating and supporting its members in efforts to comply with HB5043. Compounding the problem, if HB5043 is permitted to take effect, NSSF also anticipates a reduction in receivable NSSF membership dues.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants and provide the following relief:

1. an order declaring that the challenged portions of HB5043 violate the Second Amendment both on their face and as applied to cruciform-trigger handguns manufactured by Shadow Systems, cruciform-trigger handguns sold by Blue Trail Range, and cruciform-trigger

handguns manufactured and/or sold by other NSSF members;

2. an order temporarily, preliminarily, and permanently enjoining Defendants without bond from implementing and enforcing the challenged portions of HB5043;

3. an award of costs and attorneys' fees pursuant to 42 U.S.C. §1988 and any other applicable statute or authority; and

4. any further relief the Court deems just and appropriate.

PLAINTIFFS – NATIONAL SHOOTING SPORTS FOUNDATION, INC., SHADOW SYSTEMS LLC, AND BLUE TRAIL RANGE CORPORATION

By ________________________________

Jennifer L. Morgan – ct21751
jmorgan@harrisbeachmurtha.com
Julie A. Lavoie – ct31241
jlavoie@harrisbeachmurtha.com
HARRIS BEACH MURTHA CULLINA PLLC
265 Church Street, 9th Floor
New Haven, CT 06510
Telephone: 203.772.7700
Facsimile: 203.772.7723

Erin E. Murphy (pro hac vice forthcoming)
Matthew D. Rowen (pro hac vice forthcoming)
Kevin Wynosky (pro hac vice forthcoming)
Ilan J. Posner (pro hac vice forthcoming)
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
Telephone: (202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com
ilan.posner@clementmurphy.com

Their Attorneys

# VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Salam Fatohi declares as follows:

1. I am the Director of Research at the National Shooting Sports Foundation.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2026

By: [signature]
Salam Fatohi

**VERIFICATION OF COMPLAINT**

Pursuant to 28 U.S.C. §1746, Richard T.S. Roe declares as follows:

4. I am the Chief Operating Officer of Shadow Systems LLC.

5. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

6. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2026

By: /s/ Richard T.S. Roe
Richard T.S. Roe

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Deborah Woessner Lyman declares as follows:

1. I am the Owner, President, and Treasurer of Blue Trail Range.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2026

By: Deborah Woessner Lyman
Deborah Woessner Lyman