**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC. et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PATRICK J. GRIFFIN, in his official capacity as Chief State's Attorney et al.,<br><br>Defendants. | Civil Action No. 3:26-cv-01528<br><br>September 21, 2026 |

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPPORT OF EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, A TEMPORARY RESTRAINING ORDER

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ii

INTRODUCTION 1

BACKGROUND 4

A. Cruciform-Trigger Handguns are "America's Gun" 4

B. HB5043 Bans Sales of New Common Cruciform-Trigger Handguns After October 1 11

ARGUMENT 13

I. Plaintiffs' Challenge To HB5043 Is Likely To Succeed On The Merits. 13

A. HB5043 Restricts Conduct Covered by the Second Amendment's Plain Text 13

B. There Is No Historical Tradition of Banning Common-Use Weapons Because of the Possibility that Criminals May Unlawfully Alter Them 15

II. The Remaining Injunction Factors Overwhelmingly Support Enjoining HB5043 19

A. HB5043 Occasions a Slew of Irreparable Harms 19

B. The Equities and Public Interest Underscore the Need for Emergency Relief 22

CONCLUSION 23

## TABLE OF AUTHORITIES

### Cases

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
183 F.4th 211 (3d Cir. 2026) .......... 14

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......... 20

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) .......... 10

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) .......... 22

*Brown v. Yost*,
133 F.4th 725 (6th Cir. 2025) .......... 22

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) .......... 3

*CCIA v. Paxton*,
184 F.4th 420 (5th Cir. 2026) .......... 22

*Centro de la Comunidad v. Oyster Bay*,
868 F.3d 104 (2d Cir. 2017) .......... 22

*Council for Responsible Nutrition v. James*,
159 F.4th 155 (2d Cir. 2025) .......... 21

*Def. Distributed v. U.S. Dep't of State*,
838 F.3d 451 (5th Cir. 2016) .......... 20

*Def. Educ. v. Croton-Harmon Union Free Sch. Dist.*,
--- F.4th ----, 2025 WL 5281079 (2d Cir. Sept. 15, 2026) .......... 22

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... *passim*

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .......... 20

*Gazzola v. Hochul*,
88 F.4th 186 (2d Cir. 2023) .......... 14, 20

*Gov't Empls. Ins. Co. v. Patel*,
166 F.4th 280 (2d Cir. 2026) .......... 19

*JTH Tax, LLC v. Agnant*,
62 F.4th 658 (2d Cir. 2023) .................................................. 21

*N. Am. Soccer League v. U.S. Soccer Fed'n*,
883 F.3d 32 (2d Cir. 2018) .................................................. 13

*N.Y. Progress & Protection PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) .................................................. 22, 23

*N.Y. State Firearms Ass'n v. James*,
157 F.4th 232 (2d Cir. 2025) .................................................. 14

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) .................................................. *passim*

*Nat'l Ass'n for Gun Rts. v. Lamont*,
153 F.4th 213 (2d Cir. 2025) .................................................. 17, 18, 20

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................. 22

*Ortega v. Grisham*,
148 F.4th 1134 (10th Cir. 2025) .................................................. 20, 22

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) .................................................. 23

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) .................................................. 21

*Schrader v. D.A. of York Cnty.*,
74 F.4th 120 (3d Cir. 2023) .................................................. 23

*Smith & Wesson Brands v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025) .................................................. 10

*Snope v. Brown*,
145 S.Ct. 1534 (2025) .................................................. 3

*Staples v. United States*,
511 U.S. 600 (1994) .................................................. *passim*

*Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .................................................. 22

*United States v. Rahimi*,
602 U.S. 680 (2024) .................................................. 13, 16

*United States v. Vereen*,
152 F.4th 89 (2d Cir. 2025) .......... 14

*Wolford v. Lopez*,
146 S.Ct. 2032 (2026) .......... 13, 14, 15

*Wrenn v. District of Columbia*,
864 F.3d 650 (D.C. Cir. 2017) .......... 20

**Constitutional Provision**

U.S. Const. amend. II .......... 17

**Statutes and Regulation**

18 U.S.C. §922(a)(4) .......... 19

18 U.S.C. §922(b)(4) .......... 19

18 U.S.C. §922(*o*) .......... 11

21 U.S.C. §841(d) .......... 4, 19

26 U.S.C. §5845 .......... 11

Conn. Gen. Stat. §53a-35a(8) .......... 11

Conn. Gen. Stat. §53a-41(4) .......... 11

Conn. Gen. Stat. §53-206g .......... 4

Conn. Gen. Stat. §53a-211 .......... 19

1771 N.J. Laws 346, §10 .......... 4, 19

1884 Vt. Acts & Resolves 74, §1 .......... 19

87 Fed. Reg. 24,652 (Apr. 26, 2022) .......... 10

**Other Authorities**

ATF, *Annual Firearms Manufacturing & Export Report* (2024),
https://perma.cc/ZCU6-WWR2 .......... 10

ATF, *Machinegun Conversion Devices: Fact Sheet* (Dec. 12, 2024),
https://perma.cc/LD8J-GRB4 .......... 10

CBS News, *How Glock Became America's Gun* (Sept. 15, 2013),
https://perma.cc/6EXT-YBH6 .......... 5, 6, 8, 10

Kyle Clouse, *Is Glock Still the King of Semi-Auto Pistols?*, Liberty Safe (Jun. 13, 2025) https://perma.cc/TV8E-HZJ7 ........ 8, 9

Brad Fitzpatrick, *Top Glock Clones U.S. Buyers Are Raving About* (Mar. 12, 2026), https://perma.cc/4V65-Y6Y4 ........ 9

Forbes, *Gaston Glock & Family* (2026), https://perma.cc/AV67-93M4 ........ 9

GLOCK, *Our Safe Action® System* (2026), https://perma.cc/4GZG-DPMQ ........ 7

Frank Koppenhagen et al., *The Genesis of the Glock Pistol: How Gaston Glock Created the Dominant Design for Handguns* (2025), https://perma.cc/7YEJ-YJTQ........ 5, 6, 7, 8

Palmetto State Armory, *Top 5 Best-Selling Handguns of 2026 (So Far)*, https://perma.cc/2N35-4GB2 ........ 2

Paul Peterson, *7 Best Glock Clones for Any Budget: Buyer's Guide*, Guns.Com (Feb. 20, 2025), https://perma.cc/DK5C-NN2U........ 9

Letter from Richard Vasquez, Acting Chief, Firearms Technology Branch, ATF, to Brian A. Blakely (June 25, 2007), https://perma.cc/22Q7-7C94........ 19

*Right Side of Legal*, NSSF (2026), https://perma.cc/D4RU-BPRR........ 10

Matt Rittman, *How a Glock Works* (July 2, 2019), https://bit.ly/4wHWaOi ........ 6, 8

Elwood Shelton, *Best Concealed Carry Guns in 2026 [Field Tested]*, Gun Digest (May 22, 2026), https://perma.cc/39AJ-W396 ........ 1, 2

Statement of Governor Ned Lamont, *Testimony For Bill Number HB-05043 In All Committees*, https://perma.cc/9RNV-9WUF........11, 21

## INTRODUCTION

Semiautomatic handguns "are, in fact, 'the quintessential self-defense weapon.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)). And semiautomatic handguns equipped with cruciform trigger bars are, in fact, the quintessential handgun. Pioneered by Austrian inventor Gaston Glock in the 1980s, the cruciform-trigger design revolutionized the handgun market on both sides of the Atlantic: By integrating multiple firearm components into a single part, the cruciform-trigger design resulted in a handgun that is less expensive to produce, easier to maintain, less susceptible to component failure or debris infiltration, and—critically—less likely to accidentally discharge. *See* Elwood Shelton, *Best Concealed Carry Guns in 2026 [Field Tested]*, Gun Digest (May 22, 2026), https://perma.cc/39AJ-W396 (describing cruciform-trigger handguns as "almost boringly reliable" "thanks to a painfully simplistic design that offers few opportunities for malfunctions to occur"). That explains why, once Glock's patents expired, manufacturers like plaintiff Shadow Systems LLC began producing and selling their own cruciform-trigger handguns using the same basic design. It also explains why, for retailers like plaintiff Blue Trail Range Corporation, selling cruciform-trigger handguns to law-abiding citizens is big business: Every year, hundreds of thousands of these common arms are made in the United States and sold not just to law-abiding civilians seeking to use them for self-defense, but also to law enforcement officers, including (since 2022) every Connecticut State Trooper.

Although they are overwhelmingly used for lawful purposes, these handguns may, like "virtually any semiautomatic weapon," unlawfully "be converted … by internal modification … into a machinegun" capable of full-automatic functionality—i.e., continuously firing rounds once the trigger is actuated, instead of the standard one-round-per-trigger-pull. *Staples v. United States*, 511 U.S. 600, 615 (1994). That has understandably led the federal government and many states,

including Connecticut, to criminalize possession of handguns that have been modified in that manner, as well as the aftermarket conversion devices—commonly known as pistol "switches"—that criminals use to accomplish the modification. But despite the omnipresent potential for illegal modification to an automatic firearm, the Supreme Court has been unequivocal that the underlying semiautomatic firearms remain "lawful" to "possess[]." *Id.* at 612. That is because "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" full stop. *Bruen*, 597 U.S. at 21. Efforts to ban "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose"—such as cruciform-trigger handguns—thus "[f]ail constitutional muster" under "any" "standard." *Heller*, 554 U.S. at 628-29.

A new Connecticut law flouts those principles and precedents. Starting October 1, Substitute House Bill No. 5043 ("HB5043") will make it a felony to sell any of the market-leading cruciform-trigger handguns. Never mind if law-abiding Connecticut residents with a concealed-carry permit want to buy one of *Gun Digest*'s best concealed-carry guns of 2026. *See* Shelton, *supra*. Never mind if law-abiding Connecticut residents seeking to engage in recreational target shooting want to buy one of the top five best-selling handguns. *See* Palmetto State Armory, *Top 5 Best-Selling Handguns of 2026 (So Far)*, https://perma.cc/2N35-4GB2 (describing cruciform-trigger handguns as "prolific," "unsurpassed," and "the perfect balance of precision and reliability"). Never mind that, last year alone, sales of cruciform-trigger handguns generated tens of millions of dollars in revenue for manufacturers like Shadow Systems, and tens of thousands of dollars in revenue for retailers like Blue Trail Range. After October 1, Connecticut retailers must remove all new cruciform-trigger handguns from their shelves or subject their principals to five years in prison, unless and until manufacturers change a design that law-abiding citizens overwhelmingly prefer for its safety, reliability, and accessibility.

That law lacks any historical analogue—and the logic underlying it lacks any limit. If Connecticut can ban cruciform-trigger handguns because of the risk that criminals can convert them into fully automatic machine guns, then it could ban "virtually any semiautomatic weapon" for the same reason, *Staples*, 511 U.S. at 615, even though semiautomatic weapons are "the weapons most commonly used today for self-defense," *Caetano v. Massachusetts*, 577 U.S. 411, 417-18 (2016) (Alito, J., concurring in the judgment). *Accord Snope v. Brown*, 145 S.Ct. 1534, 1534 (2025) (Kavanaugh, J., respecting the denial of certiorari) (noting that "most handguns" today "are semi-automatic"). And it does not stop with semiautomatic weapons. If Connecticut can ban cruciform-trigger handguns because criminals can use household tools to modify them into uncommon and unlawful guns, then Connecticut could ban hunting rifles and shotguns for the same reason: Criminals have been using hacksaws to turn them into illegal short-barreled firearms since long before the days of Bonnie and Clyde. In short, if Connecticut can ban cruciform-trigger handguns because of the sheer potential to convert them into something illegal, then it is hard to see what class of firearm it could not ban.

None of that is consistent with the Second Amendment. To be sure, states have broad authority to regulate "dangerous and unusual weapons," *Heller*, 554 U.S. at 627, which is why they may ban the relatively small number of handguns that have been unlawfully converted into fully automatic firearms. But if a firearm is "in common use at the time," then it is plainly not "highly unusual in society at large." *Bruen*, 597 U.S. at 47. And the mere fact that a firearm that is typically possessed by law-abiding citizens for lawful purposes can be altered to become dangerous and unusual does not make the *unaltered* firearm less commonly used for lawful purposes. It has always been easy for landowners to convert common firearms into dangerous and unusual booby traps to ambush intruders, or for criminals to saw off the barrels of common

shotguns to turn them into illegal short-barreled firearms. But our Nation's tradition has always been one of criminalizing the modification and prosecuting the modifiers, not taking the unmodified firearm away from those who seek to keep and bear it for lawful purposes. That was true at the Founding, and it remains true today. *Compare*, *e.g.*, 1771 N.J. Laws 346, §10 (prohibiting the "most dangerous" practice of setting guns to discharge by "string, rope or other contrivance" and requiring "such person or persons [to] forfeit and [either] pay the sum of six pounds" or "be committed to the common gaol of the county[] for six months"), *with*, *e.g.*, 21 U.S.C. §841(d) (similar).

Just so here. Connecticut may ban the parts used to interfere with cruciform-trigger handgun's intended semiautomatic functioning. (In fact, it already has. *See* Conn. Gen. Stat. §53-206g.) It may aggressively prosecute both those who do the illicit modifying and those who supply illicit parts to aid it. And it may mobilize all manner of resources to educate the public about this important public-safety issue. But it cannot drive "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose" off the market. *Heller*, 554 U.S. at 628. *Heller* was clear: It is not "permissible to ban the possession of handguns so long as the possession of other firearms … is allowed." *Id.* at 629.

HB5043 is incompatible with our Nation's historical tradition of firearm regulation. And it will cause devastating, irreparable harm to Plaintiffs, their customers, and their members. The Court should preliminarily enjoin HB5043's implementation and enforcement forthwith.

## BACKGROUND

### A. Cruciform-Trigger Handguns are "America's Gun."

1. It is hard to overstate the impact that Austrian inventor Gaston Glock had on the handgun market when he unveiled the cruciform-trigger design in 1982. As one rival manufacturer put it, Glock's design "became the next generation of how the entire world makes handguns": "Every

single manufacturer from the pre-Glock era now makes a post-Glock era [cruciform-trigger] handgun." Frank Koppenhagen et al., *The Genesis of the Glock Pistol: How Gaston Glock Created the Dominant Design for Handguns* 1-2 (2025), https://perma.cc/7YEJ-YJTQ.

Although Glock had no training in firearm design, he was able to resolve a contradiction that had confounded other manufacturers: how to "combin[e] the firepower and rapid reload capability of" many "semiautomatic pistols" with "the safety and operational simplicity of" the leading "double-action revolvers" of the day. *Id.* at 2, 5, 24-25; *see also* CBS News, *How Glock Became America's Gun* (Sept. 15, 2013), https://perma.cc/6EXT-YBH6 [hereinafter *America's Gun*]. At the time, double-action revolvers—so-named because a single pull of the trigger both cocks and releases the firearm's hammer—typically held only six cartridges, took significant time to reload, and had "a long, heavy trigger pull" that was a mixed blessing: It "ma[d]e[] it virtually impossible to accidentally discharge the gun," but also "ma[d]e[] rapid and precise shooting more challenging" in self-defense situations. Koppenhagen et al., *supra*, at 5-6. By contrast, the then-predominant semiautomatic pistols used a "double-action/single-action" design: "The first shot, fired in double-action mode, require[d] a longer and heavier trigger pull, as the trigger must both cock and release the hammer. All subsequent shots [we]re fired in single-action mode," with "a shorter and lighter trigger pull." *Id.* at 6. Although those double-action/single-action semiautomatic pistols held significantly more cartridges than double-action revolvers, the "transition between different trigger pull weights" "negatively impact[ed] accuracy and shot consistency," and the design "required" "additional operating steps" that "complicate[d] the safe operation of the gun and pose[d] potential sources of operating errors, particularly in high stress conditions." *Id.*

Glock's revolutionary design resulted in "a pistol that, once chambered, remains both ready

to fire and safe to carry at all times, with a consistent trigger pull optimized for both safety and performance." *Id.* at 5. The key innovation was the so-called cruciform "trigger bar capable of movement in two non-parallel directions," a capability that enables it to "perform[] three functions that were traditionally carried out by separate components" in prior handgun designs. *Id.* at 9, 12; *see also id.* at 13-17 (explaining the more technical aspects of the mechanics); Matt Rittman, *How a Glock Works* (July 2, 2019), https://bit.ly/4wHWaOi. Because the cruciform design allows for "stamp[ing]" instead of "machin[ing]," it is also more "cost-effective" to "mass produc[e]." Koppenhagen et al., *supra*, at 20-21. As Glock put it in his original U.S. patent:

> Handling of the pistol according to the instant invention is therefore as simple as possible. The pistol is ready after chambering of the cartridge in the barrel for shooting at any time and is nonetheless completely safe from unintentional shots. Similarly in this condition the pistol is fully drop- and jar-resistant. As a result of the unchanging trigger force accuracy is increased. Simple and safe handling of the pistol is ensured even for the unpracticed user.

*Id.* at 9; *see id.* at 18 (schematic comparing operational steps for Glock versus other common firearm design). And with "significantly fewer parts" "than all competing products at the time," the cruciform-trigger pistol is "significantly simpl[er]" to maintain" and "demonstrate[d] … significantly higher" "reliability." *Id.* at 21; *see also* CBS, *America's Gun* (observing that cruciform-trigger handguns have "only 34 components—about half of most other makers," "ma[king] the gun easier to manufacture, and less likely to malfunction").

The cruciform-trigger design also allows for three sequential passive safeties, each operating independently—a groundbreaking advancement when it comes to preventing accidental discharges:




GLOCK, *Our Safe Action® System* (2026), https://perma.cc/4GZG-DPMQ (red annotation added). *First*, a safety lever integrated into the trigger blocks unintentional "rearward movement of the trigger":




Koppenhagen et al., *supra*, at 13-15. *Second*, the design of the cruciform trigger bar makes it physically impossible for the firing pin to strike the cartridge unless and until the shooter actuates the cruciform trigger bar by pulling the trigger:




*Id.* at 15. *Third*, the design of the cruciform-trigger bar makes it impossible for the firing pin to release without the shooter actuating the cruciform trigger bar:




*Id.* at 14. *See generally* Rittman, *supra*. The cruciform trigger bar's innovative design is what makes it possible to combine these redundant safeties into one integrated component, rather than relying on multiple subcomponents to work together in ways that make the firearm more susceptible to component failure or manufacturing defects.

2. That "unique balance" of safety, "performance[,] and value" has made cruciform-trigger handguns "wide[ly] popular[]" for countless "armed citizens, competition shooters, collectors, and general firearms enthusiasts." Kyle Clouse, *Is Glock Still the King of Semi-Auto Pistols?*, Liberty Safe (Jun. 13, 2025) https://perma.cc/TV8E-HZJ7; *see also* CBS, *America's Gun* (deeming

cruciform-trigger handguns "a lawnmower as far as reliability goes"). Firearms produced by Glock's eponymous company alone have consistently accounted for up to "65% market share of the handguns in the U.S." Forbes, *Gaston Glock & Family* (2026), https://perma.cc/AV67-93M4; *see* Clouse, *supra* ("[M]ore Glock pistols have been sold than any other handgun ever made, with recent estimates numbering total Glock sales topping the 20 million mark globally."). And now that the patent on Glock's cruciform-trigger bar has expired, an entire industry of manufacturers has cropped up "mak[ing] their own versions of Glock pistols," *id.*, i.e., their own version of cruciform-trigger pistols.

When it comes to so-called "Glock clone" manufacturers, Plaintiff Shadow Systems "is certainly one of the best in its class." Brad Fitzpatrick, *Top Glock Clones U.S. Buyers Are Raving About* (Mar. 12, 2026), https://perma.cc/4V65-Y6Y4 (listing, among others, the Shadow Systems MR920, and noting that Shadow Systems "produces some of the best handguns on the market" with "a lot of great features" making them both "well designed and rugged" as well as "extremely accurate and ultra reliable"); *see also* Paul Peterson, *7 Best Glock Clones for Any Budget: Buyer's Guide*, Guns.Com (Feb. 20, 2025), https://perma.cc/DK5C-NN2U (identifying Shadow Systems as manufacturing "a family of premium Glock clones" "all carry[ing] a Glock's basic DNA but with some serious genetic modifications" that "pa[y] particular attention to how a shooter's hand engages with the" pistol). As those market-leading reviews suggest, Shadow Systems guns are popular with, and commonly used by, law-abiding citizens both in and out of Connecticut: From 2021 through last month, Shadow Systems has shipped over $204 million of product to retailers nationwide, and $530,000 of product into Connecticut—virtually all of which is cruciform-trigger handguns. *See* Declaration of Richard T.S. Roe ¶5 (attached as Exhibit A). Blue Trail Range's sales figures confirm the point: In each of the past three years, Blue Trail Range has sold roughly

10 cruciform-trigger handguns made by Shadow Systems. *See* Declaration of Deborah Woessner Lyman ¶6 (attached as Exhibit B); *see also* Declaration of John McNamara ¶7 (attached as Exhibit C).

As a class, well over 500,000 cruciform-trigger handguns are manufactured for sale in the United States annually. *See, e.g.*, ATF, *Annual Firearms Manufacturing & Export Report* 15, 51, 201-02 (2024), https://perma.cc/ZCU6-WWR2. By any measure, and as the federal government has acknowledged across multiple administrations, these handguns are "popular for civilian use." 87 Fed. Reg. 24,652, 24,655 (Apr. 26, 2022); *see also Bianchi v. Brown*, 111 F.4th 438, 455 (4th Cir. 2024) (en banc) (referring to a cruciform-trigger handgun as a "commonly used handgun"); *id.* at 527 (Richardson, J., dissenting) (similar).

3. While safety, reliability, and affordability help explain why cruciform-trigger handguns have become the handgun of choice for law-abiding citizens, they are decidedly *not* the firearm of choice for criminals. Quite the contrary: ATF data tracking "weapons recovered at crime scenes" dispels any suggestion that cruciform-trigger handguns are "distinctively used" by criminals "more than other guns." CBS, *America's Gun* ("The notion that every gangster in every city is walking around with a Glock just isn't true."). That said, "one of the most prominent emerging public and law enforcement officer safety threats in recent years has been the proliferation of illegal" machine gun conversion devices ("MCD"). *Right Side of Legal*, NSSF (2026), https://perma.cc/D4RU-BPRR. "MCDs include traditional 'Drop in Auto Sears,' which are designed for use on AR-type firearms," *id.*—i.e., "the most popular rifle in the country" among law-abiding citizens, *Smith & Wesson Brands v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025). MCDs also include "more recently developed 'switches,' which are designed for use on" cruciform-trigger handguns. *Right Side of Legal*, *supra*; *see* ATF, *Machinegun Conversion Devices: Fact Sheet* (Dec. 12, 2024),

https://perma.cc/LD8J-GRB4.

### B. HB5043 Bans Sales of New Common Cruciform-Trigger Handguns After October 1.

For decades, lawmakers have responded to the threat of MCDs by criminalizing the MCDs themselves, as well as firearms equipped with them. Federal law, for instance, criminalizes "machinegun" possession, *see* 18 U.S.C. §922(*o*), and defines "machinegun" as "any" fully automatic weapon, as well as "any part designed and intended … for use in converting a weapon into a machinegun," 26 U.S.C. §5845. Section 53-206g of the Connecticut General Statutes likewise criminalizes possession of any "rate of fire enhancement," which is defined to include "any device, component, part, combination of parts, attachment or accessory that … causes a semiautomatic firearm to fire more than one round per operation of the trigger." But as the Supreme Court noted in *Staples v. United States*—itself a case about an illegally modified, fully automatic AR-15—unmodified semiautomatic firearms have always remained "lawful" to "possess[]." 511 U.S. at 612.

HB5043 breaks that unbroken tradition "by prohibiting the future sale of new [cruciform-trigger] handguns." Statement of Governor Ned Lamont, *Testimony For Bill Number HB-05043 In All Committees*, https://perma.cc/9RNV-9WUF. Effective October 1, 2026, HB5043 makes it "a class D felony" for "[a]ny individual or firm, partnership, corporation, limited liability company, association or other similar entity" to "knowingly import[] into this state or knowingly advertise[], sell[], offer[] or expose[] for sale any convertible pistol … manufactured on or after October 1, 2026." Compl.Ex.A.3. A class D felony is punishable by up to five years imprisonment and a fine of up to $5,000. Conn. Gen. Stat. §§53a-35a(8), 53a-41(4).

HB5043 defines "convertible pistol" as "any semiautomatic pistol with a cruciform trigger bar that can be readily altered by hand or with a common household tool so that the pistol can be

readily converted into a machine gun by the installation or attachment of a pistol converter." Compl.Ex.A.2. A pistol converter is in turn defined as "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, interferes with the trigger mechanism, thereby enabling the pistol to discharge a number of shots or bullets rapidly or automatically with one continuous pull of the trigger." Compl.Ex.A.3.[1] The only way for a cruciform-trigger handgun to fall outside HB5043's definition of "convertible pistol" is if it "has a tab or other piece of material molded to the pistol's frame" that cannot "be readily removed" and "that shields the cruciform trigger bar from … a pistol converter." Compl.Ex.A.2.

Changing the well-known cruciform-trigger design to conform to Connecticut's preferences would cost manufacturers like Shadow Systems substantial time and money. And there is no guarantee that law-abiding consumers who have come to overwhelmingly prefer the current design owing to its decades-earned reputation of safety and reliability will be enthusiastic about switching to an alternative. Nor is there any guarantee, even if manufacturers' investment in developing a commercially viable alternative pays off, that Connecticut will not amend HB5043 to ban that handgun next. At bottom, no amount of design alteration can ever make a handgun impervious to criminal misuse, or change the reality that "virtually any semiautomatic weapon may be converted" "into a machinegun" by someone set on committing that crime. *Staples*, 511 U.S. at 615. *See generally* Roe.Decl. ¶8; McNamara.Decl. ¶10. The same (il)logic underlying HB5043 thus could be invoked to ban semiautomatic firearms entirely.

---

[1] HB5043 also amends the definition of "machine gun" in Conn. Gen. Stat. §53-202(a) so that it "includ[es] any convertible pistol that is equipped with a pistol converter." Compl.Ex.A at 1. Plaintiffs do not challenge this aspect of HB5043.

## ARGUMENT

Rule 65 allows district courts to issue preliminary injunctions "maintain[ing] the status quo pending resolution of the case." *N. Am. Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 36 (2d Cir. 2018). Plaintiffs seeking such injunctions must show "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party." *Id.* at 37. Plaintiffs must also show that they will be "irreparabl[y] harm[ed]" absent a preliminary injunction, and "that a preliminary injunction is in the public interest." *Id.* Here, every factor supports preliminarily enjoining the challenged portions of HB5043.

### I. Plaintiffs' Challenge To HB5043 Is Likely To Succeed On The Merits.

#### A. HB5043 Restricts Conduct Covered by the Second Amendment's Plain Text.

1. As the Supreme Court recently reiterated, the first question "in a Second Amendment case" is "whether the law before [the court] clashes with the 'plain text' of the Amendment's language." *Wolford v. Lopez*, 146 S.Ct. 2032, 2043 (2026). If it does—i.e., if the challenged law "regulates arms-bearing conduct" in any respect, *United States v. Rahimi*, 602 U.S. 680, 691 (2024)—then it implicates the Second Amendment, and the state bears the burden to prove that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Answering that threshold question (i.e., "*Bruen*'s first step") does not require "a lengthy discussion of historical materials and precedents" to determine the full scope of the right the Second Amendment protects. *Wolford*, 146 S.Ct. at 2049. It requires only a straightforward inquiry into "how contemporaries understood the text" of the Amendment. *Id.* at 2054 (Barrett, J., concurring).

The first-step inquiry "entails three subsidiary questions" tracking what the words of the Amendment themselves address. *Id.* at 2043 (majority op.). First, does the challenged law "apply to 'the people,'" i.e., "'all members of the political community'?" *Id.* (quoting *Heller*, 554 U.S. at 580). Second, does it "concern any form of 'Arms,' i.e., any weapon customarily used for

offensive or defensive purposes?" *Id.* Third, does it "place any restrictions on either the 'keep[ing]' (i.e., possession) or the 'bear[ing]' (i.e., carrying) of arms?" *Id.* (alterations in original).

Here, the answer to each of those questions is undoubtedly yes. HB5043 makes it a crime to sell a cruciform-trigger handgun to any and all members of the public ("the people"). Cruciform-trigger handguns are plainly "Arms" as that term was understood at the Founding and still is today. *See Heller*, 554 U.S. at 581 ("Arms" covers "any thing that a man … takes into his hands, or useth in wrath to cast at or strike another"); *Bruen*, 597 U.S. at 28 (the "general definition" of "arms" "covers" all "modern instruments that facilitate armed self-defense"). Indeed, "[e]ven the narrowest Founding-era definition of 'Arms' addressed by the *Heller* Court 'stated that all firearms constituted "arms."'" *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 183 F.4th 211, 239 (3d Cir. 2026) (en banc) (quoting *Heller*, 570 U.S. at 581-82). And HB5043 restricts both the keeping and the bearing of these arms, *see Wolford*, 146 S.Ct. at 2043-44, as it makes it virtually impossible to lawfully acquire one.

2. To be sure, the Second Circuit held before *Wolford* that "'regulations on the means of acquiring … firearms only implicate the text of the Second Amendment if they *meaningfully constrain* the right to possess and carry arms.'" *N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 244 (2d Cir. 2025) (emphasis original) (quoting *United States v. Vereen*, 152 F.4th 89, 94-95 (2d Cir. 2025)). But the Second Circuit has made clear that "a State cannot impose a regulation on commercial firearms dealers as a class that has the effect of prohibiting law-abiding, responsible citizens from possessing common-use weapons." *Gazzola v. Hochul*, 88 F.4th 186, 196 n.6 (2d Cir. 2023). That is precisely what HB5043 does. Connecticut's ban thus implicates the Second Amendment even under those precedents.

That said, the Second Circuit's "meaningful constraints" test does not survive the Supreme

Court's intervening decision in *Wolford*, as it impermissibly "smuggle[s] additional limits … into the plain-text stage of the inquiry," *Wolford*, 146 S.Ct. at 2054 n.1 (Barrett, J., concurring). *Wolford* made clear that a law that "burdens those wishing to exercise their Second Amendment right" "fall[s] within the plain text of the Second Amendment" no matter how it imposes that burden. *Id.* at 2047-49 (majority op.). Hawaii argued in *Wolford* that its restriction escaped historical scrutiny because the Second Amendment does not explicitly address "the right to armed entry onto private property without the owner's consent." *Id.* at 2049. The Court rejected that argument. It made no difference that Hawaii's law operated by requiring property owners to provide consent. All that matters is that, by making it illegal for people to carry a firearm as they go about their daily lives unless they secure advance consent from property owners, Hawaii "impose[d] a new burden" on those seeking to bear arms. *Id.* at 2047-48.

Here, too, it makes no difference that the Second Amendment does not explicitly mention the acquisition of firearms. Nor does it matter that HB5043 operates against firearm sellers rather than firearm buyers. HB5043 restricts which arms people can acquire. That plainly imposes a burden on people seeking to bear arms—especially when the class of arms the state has singled out is not just "in common use," *Bruen*, 597 U.S. at 47, but "overwhelmingly chosen by American society for th[e] lawful purpose" "of self-defense," *Heller*, 554 U.S. at 628-29. Indeed, the notion that a ban on selling the single most popular class of handguns in the country does not even implicate the Second Amendment defies common sense.

### B. There Is No Historical Tradition of Banning Common-Use Weapons Because of the Possibility that Criminals May Unlawfully Alter Them.

1. When as here, a state law implicates arms-bearing conduct, the burden shifts to the state to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits … the right to keep and bear arms." *Bruen*, 597 U.S. at 19. "A variety of sources … may aid this

inquiry." *Wolford*, 146 S.Ct. at 2044. But "the best evidence" is "what *Bruen* called historical analogues": "[o]ld legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right." *Id.* And not any old rule will do; a state must come forward with "well-established and representative historical analogue[s]," *Bruen*, 597 U.S. at 30 (emphasis omitted), that restricted arms-bearing conduct "for similar reasons" as the modern law (i.e., "to address [the] particular" public policy "problem[]") and to a similar "extent" as "was done at the founding," *Rahimi*, 602 U.S. at 692. *Accord Bruen*, 597 U.S. at 67 ("[W]e will not stake our interpretation of the Second Amendment upon a law in effect in a single State, or a single city.").

Those guideposts direct the historical analysis for various modern restrictions on arms-bearing. But when states endeavor to drive certain arms from the market entirely, courts need not conduct an extensive historical analysis to "delimit[] the outer bounds of the right to keep and bear arms," *Bruen*, 597 U.S. at 19, because *Heller* already did that work. "Drawing from th[e] historical tradition" of laws that "prohibited the carrying of 'dangerous and unusual weapons,'" *id.* at 47, the Court concluded in *Heller* that states may not ban arms that "law-abiding citizens" "typically possess[] … for lawful purposes." *Heller*, 554 U.S. at 625. That was no stray dicta. While much of *Heller* was focused on whether the Second Amendment protects an individual right at all, the ultimate question before the Court was whether the District of Columbia's handgun ban was constitutional. The Court thus "*ha*[*d*] to consider … what types of weapons" the Second Amendment protects. *Id.* at 624 (emphasis altered). And it concluded that "the sorts of weapons protected [a]re those 'in common use at the time'" "for lawful purposes like self-defense." *Id.* at 624, 627. Of course, the Supreme Court did not need to determine precisely what marks the dividing line between arms that are "in common use" for lawful purposes and arms that are "not

typically possessed by law-abiding citizens for lawful purposes," *id.* at 624-25, because the law at issue in *Heller* banned "an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose" "of self-defense," *id.* at 628-29. But the Court *did* have to identify the constitutional rule that governs arms bans, and the Court held that the government may not ban arms that are "'in common use at the time' for lawful purposes like self-defense." *Id.* at 624.

Under that rule, HB5043 is clearly unconstitutional. Indeed, HB5043 is not materially different from the D.C. law in *Heller*. The only meaningful distinction is that HB5043 applies to one (very large) subset of handguns, whereas the District's law applied to all handguns. But when it comes to the historical tradition the Supreme Court has identified, that distinction makes no difference. In *Heller*, the District tried to defend its ban by pointing to the ability of citizens to keep and bear long guns. The Supreme Court rejected that argument in no uncertain terms. "It is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Id.* at 629. So too here: "It is no answer to say" that the people may still purchase non-cruciform-trigger handguns. *Id.* Banning "an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose" "of self-defense" "fail[s] constitutional muster." *Id.* at 628-29. Because cruciform-trigger handguns are among "the most popular weapon[s] chosen by Americans for self-defense in the home," *id.* at 629, the Second Amendment prevents Connecticut from denying "the people" their "right" "to keep and bear" them, U.S. Const. amend. II.

2. While that is the law of the land according to the Supreme Court, it is not the law of this Circuit—at least at present. The Second Circuit has taken the view that "*Heller* and *Bruen* … do not hold that the Second Amendment *necessarily* protects *all* weapons in common use" and "do not shield popular weapons from review of their potentially unusually dangerous character." *Nat'l*

*Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 232-33 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (U.S. June 30, 2026). Under *Lamont*, a state may treat "unusually dangerous weapons of an offensive character" as if "they are not used or intended to be used for lawful purposes, principally individual self-defense," even if they are in fact commonly used for exactly those reasons. *Id.* at 234-36.

It is difficult (to say the least) to square that view with Supreme Court precedent, as it elevates the perceptions and preferences of government officials over the choices and preferences of the people whose rights the Second Amendment secures. That may explain why the Supreme Court has granted certiorari to review *Lamont*. But even under *Lamont*, HB5043 falls on the invalid side of the line. There is nothing "offensive" or "unusually dangerous" about cruciform-trigger handguns. Indeed, *Lamont* offered up cruciform-trigger handguns "like the Glock 17" for the express purpose of identifying what the court did *not* consider to be an "offensive" or "unusually dangerous" weapon. *Id.* at 242. And the court underscored that part of why it considered the state statutes at issue there constitutional is because they still "permit[ted] Connecticut residents to own and possess popular semiautomatic handguns like the Glock 17." *Id.* HB5043 thus goes after precisely the arms that the Second Circuit considered quintessential protected arms.

HB5043 does so, moreover, not on the theory that cruciform-trigger handguns are themselves unusually dangerous, but because they can be converted into something that is. That is fundamentally inconsistent with our Nation's historical tradition. The problem of bad actors trying to convert common self-defense weapons into more lethal, offensive weapons is not a new one. For as long as firearms have existed, criminals unfortunately have been attempting dangerous firearm conversions. And governments have responded by banning the conversion and the

converted arm, not by banning the common firearm just because it can be so converted.

For example, criminals have always been able to convert common firearms into dangerous and unusual booby traps. The tradition at the Founding was to criminalize these so-called trap guns but to leave the unmodified gun legal to purchase and possess. *See, e.g.*, 1771 N.J. Laws 346, §10. That remained the tradition when the states ratified the Fourteenth Amendment. *See, e.g.*, 1884 Vt. Acts & Resolves 74, §1. And it remains the tradition today. *See, e.g.*, 21 U.S.C. §841(d). Criminals have likewise always been able to convert long guns commonly used for hunting and other lawful purposes into illegal short-barreled rifles and shotguns. Here, too, the unbroken tradition has been to criminalize the sawed-off variants (and prosecute those doing the sawing) but leave the unmodified rifles and shotguns lawful to purchase and possess. *See, e.g.*, 18 U.S.C. §922(a)(4), (b)(4); Conn. Gen. Stat. §53a-211.

More recently, criminals have devised no shortage of ways to turn common semiautomatic arms into illegal machine guns, from "fil[ing] away" internal safeguards (as in *Staples*, 511 U.S. at 603) to simply tying a shoelace "to the cocking handle of a semiautomatic rifle" (as described in, *e.g.*, Letter from Richard Vasquez, Acting Chief, Firearms Technology Branch, ATF, to Brian A. Blakely (June 25, 2007), https://perma.cc/22Q7-7C94). Once again, the modern response in the overwhelming number of jurisdictions reflects the Founding-era tradition: ban the modification and the modified firearm, but leave the unmodified firearm legal to purchase and possess. HB5043's stark departure from that approach cannot be reconciled with our Nation's historical tradition of firearms regulation.

## II. The Remaining Injunction Factors Overwhelmingly Support Enjoining HB5043.

### A. HB5043 Occasions a Slew of Irreparable Harms.

As the attached declarations make clear, HB5043 causes all manner of irreparable harm for all manner of Connecticut residents and businesses. *See Gov't Empls. Ins. Co. v. Patel*, 166 F.4th

280, 291 (2d Cir. 2026) (calling irreparable harm "the single most important prerequisite for the issuance of a preliminary injunction"). The harm is perhaps most stark for the legions of law-abiding Connecticut citizens who face an indefinite deprivation of Second Amendment rights—a deprivation that is plainly irreparable, as multiple courts to consider the question have agreed. *See, e.g.*, *Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025); *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023); *Wrenn v. District of Columbia*, 864 F.3d 650, 667-68 (D.C. Cir. 2017); *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 457 (5th Cir. 2016); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

Although the Second Circuit has technically left this question open, *see Lamont*, 153 F.4th at 248 (assuming without deciding that Second Amendment violations automatically give rise to irreparable injury), it has noted that First, Fourth, and Eighth Amendment violations automatically give rise to irreparable injury, and it has quite properly been "reluctant to run afoul of the Supreme Court's admonishment that the Second Amendment is not a 'second-class right' by treating this constitutional harm differently than we have treated others in the past," *id.* (citation omitted). This Court should be reluctant to do so too. And one thing the Second Circuit has not been reluctant about is allowing "gun store[s]" like Blue Trail Range and gun manufacturers like Shadow Systems to "bring a derivative constitutional challenge" "on behalf of their customer base." *Gazzola*, 88 F.4th at 194-95 ("We have no trouble concluding that [firearm businesses] have standing to bring such a derivative claim.").

The irreparable harm is no less obvious for Connecticut-based NSSF-member manufacturers and retailers, including (but not limited to) Blue Trail Range and Shadow Systems. In an average year, Blue Trail Range reasonably expects to sell 10 cruciform-trigger handguns made by Shadow Systems, to say nothing of cruciform-trigger handguns made by Ruger, Palmetto

State Armory, Beretta, and others. *See* Lyman.Decl. ¶¶6-7. Starting October 1, however, that number will plummet to zero and remain there indefinitely absent relief. Lyman.Decl. ¶8. And customers who come into Blue Trail Range seeking to purchase a cruciform-trigger handgun will not inevitably pivot to some other style of handgun. Customers often come into the store specifically looking to purchase a cruciform-trigger handgun—precisely because its design has for decades proven safe, reliable, and affordable—and like any consumer, firearms purchasers sometimes walk out of Blue Trail Range if the store does not stock what they want. Lyman.Decl. ¶12. Because sovereign immunity makes it impossible for Blue Trail Range to recover damages, that loss in business opportunity constitutes irreparable injury, to say nothing of the loss in customer goodwill. *See Council for Responsible Nutrition v. James*, 159 F.4th 155, 172 (2d Cir. 2025) ("Unrecoverable lost sales … can constitute irreparable harm."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (similar).

That all goes double for Shadow Systems. For each of the past five years, it has averaged over $100,000 of Connecticut business annually, all cruciform-trigger handguns that will be impossible to sell starting October 1. Roe.Decl. ¶5. Having already watched a materially identical California law slash its California cruciform-trigger-handgun sales from millions to nil, Shadow Systems has no doubt that history will unfortunately repeat itself in Connecticut as a result of HB5043. Roe.Decl. ¶6. That expectation is hard to argue with, given that Shadow Systems deals almost exclusively in cruciform-trigger handguns, and given that Governor Lamont has been unsubtle about HB5043's goal: to "prohibit the future sale of new [cruciform-trigger] handguns" altogether. Statement of Governor Ned Lamont, *supra*; *see JTH Tax, LLC v. Agnant*, 62 F.4th 658, 668 (2d Cir. 2023) (finding "irreparable harm where 'the very viability of the plaintiff's business' is 'threatened'"). Adding insult to (irreparable) injury, the only way for Shadow Systems to

recapture any of that lost revenue would be to engage in resource- and time-intensive R&D, hemorrhaging sales in the meantime, all to chase a new design that consumers may not embrace and that may itself be banned next since "virtually any semiautomatic weapon may be converted, either by internal modification or, in some cases, simply by wear and tear, into a machinegun." *Staples*, 511 U.S. at 615; Roe.Decl. ¶8. *See CCIA v. Paxton*, 184 F.4th 420, 431 (5th Cir. 2026) (collecting cases holding that unrecoverable compliance costs constitute irreparable injury).

Recent 42 U.S.C. §1983 caselaw confirms that NSSF has standing to vindicate the interests of its Connecticut-based members. *See Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (holding that a membership organization suing under §1983 may "assert 'standing solely as the representative of its members'"); *accord Def. Educ. v. Croton-Harmon Union Free Sch. Dist.*, --- F.4th ----, 2025 WL 5281079 (2d Cir. Sept. 15, 2026). And cases old and new confirm that HB5043 has also injured NSSF "in its own right," *Students for Fair Admission*, 600 U.S. at 199, by causing NSSF to lose membership dues and by requiring NSSF to divert resources, monetary and otherwise—including resources currently devoted to its "Right Side of Legal" campaign—to help its Connecticut-based members weather HB5043's storm. *See also* McNamara.Decl. ¶¶8, 11; *Centro de la Comunidad v. Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (noting that "only a 'perceptible impairment' of an organization's activities is necessary" and describing the inquiry as "somewhat relaxed").

**B. The Equities and Public Interest Underscore the Need for Emergency Relief.**

When a state government "is the opposing party," the third and fourth injunction factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And when the plaintiffs are challenging government action as unconstitutional, the merged equities/public-interest inquiry travels together with the merits analysis, both because Connecticut "does not have an interest in the enforcement of an unconstitutional law," and because "securing [Second] Amendment rights is in the public

interest." *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Numerous circuits agree. *See, e.g.*, *Ortega*, 148 F.4th at 1154 n.13; *Brown v. Yost*, 133 F.4th 725, 737-38 (6th Cir. 2025); *Book People, Inc. v. Wong*, 91 F.4th 318, 340-41 (5th Cir. 2024); *Schrader v. D.A. of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023); *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). In short, when the merits analysis weighs in favor of an injunction (as it does here, *see supra* Part I), the merged equities/public-interest factor does too. *See N.Y. Progress & Protection*, 733 F.3d at 488 (collecting cases for the proposition that "[c]onsideration of the merits is virtually indispensable" in constitutional cases, "where the likelihood of success on the merits is the dominant, if not the dispositive, factor").

* * *

At bottom, cruciform-trigger handguns have been on the market for over 40 years, and illegal pistol switches have been around in some form or fashion for nearly as long. For all that time, Connecticut managed to balance the need to respect the Second Amendment with the need to protect the public from fully automatic handguns by banning modified cruciform-trigger handguns and prosecuting the modifiers, while leaving unmodified cruciform-trigger handguns available for purchase by law-abiding citizens who pass a background check. That balance should remain the status quo for the pendency of this litigation too.

## CONCLUSION

The Court should enjoin the challenged portions of HB5043 pending resolution of Plaintiffs' Second Amendment claim.

PLAINTIFFS – NATIONAL SHOOTING SPORTS FOUNDATION, INC., SHADOW SYSTEMS LLC, AND BLUE TRAIL RANGE CORPORATION

By /s/ Jennifer L. Morgan

Jennifer L. Morgan – ct21751
jmorgan@harrisbeachmurtha.com
Julie A. Lavoie – ct31241
jlavoie@harrisbeachmurtha.com
HARRIS BEACH MURTHA CULLINA PLLC
265 Church Street, 9th Floor
New Haven, CT 06510
Telephone: 203.772.7700
Facsimile: 203.772.7723

Erin E. Murphy (pro hac vice forthcoming)
Matthew D. Rowen (pro hac vice forthcoming)
Kevin Wynosky (pro hac vice forthcoming)
Ilan J. Posner (pro hac vice forthcoming)
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
Telephone: (202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com
ilan.posner@clementmurphy.com

Their Attorneys

**CERTIFICATE OF SERVICE**

On September 21, 2026, I electronically filed this memorandum in accordance with the U.S. District Court for the District of Connecticut's Electronic Filing Policies and Procedures by using the Court's CM/ECF system. I also sent a courtesy copy of this motion and of Plaintiffs' Verified Complaint to the Connecticut Division of Criminal Justice by email to conndcj@ct.gov. I am also presently effecting service of process upon Defendants consistent with Federal Rule of Civil Procedure 4.

s/Jennifer L. Morgan
Jennifer L. Morgan