UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GLOCK, INC., *Plaintiff*, v. PATRICK J. GRIFFIN *et al*, *Defendants*. | ) | 3:26-CV-01525 (KAD) SEPTEMBER 30, 2026 |
| NATIONAL SHOOTING SPORTS FOUNDATION INC., *et al*, *Plaintiffs*, v. PATRICK J. GRIFFIN *et al*, *Defendants*. | ) | 3:26-CV-01528 (KAD) SEPTEMBER 30, 2026 |

**ORDER GRANTING PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION (No. 26-CV-1525, ECF No. 3; No. 26-CV-1528, ECF No. 4)**

Kari A. Dooley, United States District Judge:

On September 21, 2026, Plaintiff Glock, Inc. ("Glock") commenced this action against Defendants Patrick J. Griffin in his official capacity as Chief States Attorney; Margaret E. Kelley, Joseph T. Corradino, Stacey Miranda, Sharmese L. Walcott, David R. Shannon, Michael A. Gailor, Christian M. Watson, John P. Doyle, Jr., Paul J. Narducci, David R. Applegate, Craig P. Nowak, Maureen Platt, and John F. Fahey in their official capacities as States Attorney for each of Connecticut's Judicial Districts; and Ronnell A. Higgins in his official capacity as Commissioner of the Connecticut Department of Emergency Services and Public Protection (collectively "Defendants"). *See Glock, Inc. v. Griffin et al*, No. 26-cv-1525, Mot. for TRO, ECF No. 3.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Glock filed a motion for Temporary Restraining Order and Preliminary Injunction seeking to bar Defendants from implementing and enforcing the ban on "convertible pistols" established in House Bill 5043 ("HB 5043"),[1] which entered into law on May 26, 2026 and goes into effect on October 1, 2026. H.B. 5043, 2026 Gen. Assemb., Feb. Sess. (Conn. 2026); *see also* Mot. for TRO, ECF No. 3 at 1. Glock challenges the constitutionality of HB 5043 under, *inter alia*, the Second and Fourteenth Amendments to the United States Constitution.[2] Glock asserts that the impending ban on the sale and advertising of convertible pistols will cause irreparable harm to Glock and Connecticut citizens. Mot. for TRO, ECF No. 3 at 1. Defendants oppose on the basis that Glock has no likelihood of success on the merits, HB 5043 comports with Second Amendment jurisprudence, and Glock has not established irreparable harm. Opp'n, ECF No. 26 at 7–8. The Court has also considered Glock's Notice of Additional Authority. Not., ECF No. 27.

Likewise on September 21, 2026, Plaintiffs National Shooting Sports Foundation, Inc., Shadow Systems LLC, and Blue Trail Range Corporation (collectively "NSSF Plaintiffs"), commenced an action against the same Defendants as are named in the Glock matter, with the omission of Defendant Higgins. *See Nat'l Shooting Sports Found. Inc. et al v. Griffin et al*, No. 26- cv-1528, Mot. for TRO, ECF No. 4. The NSSF Plaintiffs are a firearms industry trade association, a firearms manufacturer, and a firearms retailer, respectively. NSSF Plaintiffs similarly seek to enjoin Defendants from enforcing and implementing the challenged portions of HB 5043 during the pendency of the litigation on NSSF Plaintiffs' Second Amendment Claim. *Id.*

[1] When HB 5043 passed, it became Public Act 26-41. Plaintiffs refer to the legislation as HB 5043 while Defendants refer to the legislation as Public Act 26-41. The Court refers to the legislation as HB 5043 simply for the purpose of internal consistency within its decision.

[2] Glock raises a number of challenges to the statute. The Court discusses only the challenge premised on the Second Amendment.

at 1. NSSF Plaintiffs allege their challenge is likely to succeed on the merits, there is no historical tradition of banning weapons simply because criminals may unlawfully alter them in the future, and NSSF Plaintiffs, customers, and members will suffer irreparable harm in the absence of injunctive relief. *Id*. at ECF No. 4-1 at 7–10. Defendants reject NSSF Plaintiffs' assertions, arguing NSSF Plaintiffs have no likelihood of success on the merits, HB 5043 comports with Second Amendment jurisprudence, and NSSF Plaintiffs have not established irreparable harm. Opp'n, ECF No. 39 at 7–9. NSSF Plaintiffs filed a Reply arguing they are likely to succeed on the merits because HB 5043 is presumptively unconstitutional and they have demonstrated "a slew of irreparable harms." Reply, ECF No. 40 at 2–7.

The Court convened a joint hearing on both matters on September 29, 2026. For the reasons set forth below, the Motions for a Preliminary Injunction in both matters, No. 25-cv-1525, ECF No. 3 and No. 25-cv-1528, ECF No. 4, are **GRANTED**.

**Standard of Review**

"Issuance of preliminary injunctive relief, such as a TRO or preliminary injunction, is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Reidy*, 477 F. Supp. 2d 472, 474 (D. Conn. 2007) (quoting *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005)). "[T]he traditional standards which govern consideration of an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction." *Loc. 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). "To establish their entitlement to a preliminary injunction, Plaintiffs must show that (1) they are likely to succeed on the merits of their claims, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities

tips in their favor, and (4) issuing an injunction is in the public interest." *Nat'l Assn. of Gun Rts. v. Lamont*, 153 F.4th 213, 228 (2d Cir. 2025) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "A district court has wide discretion in determining whether to grant preliminary injunctive relief." *Green v. Caron*, No. 3:22-cv-1397 (KAD), 2023 WL 6809620, at *1 (D. Conn. Oct. 16, 2023) (citing *Moore*, 409 F.3d at 511).

**HB 5043**

House Bill 5043 ("HB 5043") was entered into law on May 26, 2026 and goes into effect on October 1, 2026. H.B. 5043, 2026 Gen. Assemb., Feb. Sess. (Conn. 2026). In pertinent part, the Act establishes that a "(1) 'Machine gun' [shall apply to and include] means (A) a weapon of any description, loaded or unloaded, [which] that shoots, is designed to shoot or can be readily restored to shoot automatically more than one projectile, without manual reloading, by a single function of the trigger, including *any convertible pistol* that is equipped with a pistol converter, as defined in subsection (c) of section 53-206g, as amended by this act[.]" *Id*. at § (1)(a)(1)(A) (emphasis added).

Subsection (1)(a)(B) specifies that:

> (4) "Convertible pistol" means any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or with a common household tool into a machine gun solely by the installation or attachment of a pistol converter, as defined in subsection (c) of section 53-206g, as amended by this act, whether or not there is a notch at the rear of the pistol frame. "Convertible pistol" does not include (A) any hammer-fired semiautomatic pistol, or (B) any semiautomatic pistol with a cruciform trigger bar that has a tab or other piece of material molded to the pistol's frame that shields the cruciform trigger bar from interference by a pistol converter, unless the tab or other piece of material can be readily removed from the pistol's frame.
>
> (5) "Cruciform trigger bar" means a component in a semiautomatic pistol that serves as a linkage between the trigger and firing pin and has its sear incorporated in a cross-shaped surface.

> (6) "Common household tool" includes, but is not limited to, a screwdriver, hammer, chisel, file or crescent wrench.

Critically, and at issue here, "[a]ny individual or any firm, partnership, corporation, limited liability company, association or other similar entity that, within this state, distributes, transports or imports into the state, keeps for sale, or offers or exposes for sale, any convertible pistol, as defined in section 53-202 of the general statutes, as amended by this act, shall be guilty of a class D felony." *Id*. at § (3)(a).

***Bruen***[3]

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Amendment enshrines an individual right to bear arms and "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635. Subsequently, the Court extended *Heller*'s holding to the states in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). A decade later, in *Bruen*, the Supreme Court clarified the test required for assessing Second Amendment challenges. Noting that lower courts had improperly "coalesced around" a "two-step" analysis for disposing of Second Amendment challenges that combined "history with means-end scrutiny," the Court held that the correct test must be "rooted in the Second Amendment's text, as informed by history" and that the government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.

*Bruen* requires a two-step analysis. "First, a court must determine whether the law before it clashes with the 'plain text' of the Amendment's language." *Wolford v. Lopez*, 609 U.S. 185,

[3] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

195 (2026) (citing *Bruen*, 597 U.S. at 24). This determination requires consideration of whether the law applies to all people, *id*. (citing *Heller*, 554 U.S.at 580), whether it concerns any form of arms, *id*. (citing *Heller*, 554 U.S.at 584), and whether any restrictions are placed on keeping or bearing arms, *id*. (quoting *Bruen*, 597 U.S. at 32–33). *See also Wolford*, 609 U.S. at 185–86. If this threshold is met, the challenged law is presumptively unconstitutional. *Id*. at 196 (citing *Bruen*, 597 U.S. at 24). Only if the Court finds that the Second Amendment is implicated, does the analysis proceed to the second step.

At step two, the government may rebut the presumption of unconstitutionality by "show[ing] that its challenged law did not infringe the historical understanding of the codified right." *Id*. at 196 (citing *Bruen*, 597 U.S. at 24). Although numerous sources may assist a court in this inquiry, "the best evidence is often what *Bruen* called historical analogues" which are "old legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right." *Id*. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Bruen*, 597 U.S. at 28–29 (quoting C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)). As *Bruen* made clear, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id*. at 30. Therefore, *Bruen* identified three inquiries a court should make to evaluate a historical analogue. *See Wolford*, 609 U.S. at 196. Those inquiries are (1) "the number of jurisdictions in which they were adopted[,]" *id*., (citing *Bruen*, 597 U.S. at 67); (2) the extent to which the laws were well-accepted, either expressly through judicial decisions, or tacitly, *id*., (citing *Bruen*, 597 U.S. at 36); and (3) whether the analogue or

analogues are "relevantly similar" to the modern law in question, *id*. (citing *Bruen*, 597 U.S. at 29).

To determine whether an analogue is "relevantly similar," a court must consider how and why the analogue restricted the keeping or bearing of arms. *Id*. (quoting *Bruen*, 597 U.S. at 29). "In order to be sufficiently similar to the modern law being challenged, a putative analogue need not be a 'dead ringer' or 'historical *twin*.'" *Id*. at 196–97 (emphasis in original) (quoting *Bruen*, 597 U.S. at 30).

**Discussion**[4]

For purposes of the motion for preliminary injunction only, the Defendants[5] accept that HB 5043 implicates the plain text of the Second Amendment. *Bruen*, 597 U.S. at 24. Accordingly, the statute fails the inquiry at Step One of the *Bruen* analysis. This renders the statute "presumptively unconstitutional." *Wolford*, 609 U.S. at 196. Where the statute is presumptively unconstitutional, the burden then shifts to the Defendants to demonstrate that the regulation is consistent with the historical tradition of firearms regulation in this country. *Id*.

In that vein, Defendants rely on two types of regulations which, in combination they argue, supports the assertion that the statute does not run afoul of the Second Amendment. The first is so-called proving laws and the second is the historical tradition of restricting the sale of fully automatic guns such as machine guns. Defendants argue that proving laws — regulations designed to ensure that products were safe for consumer use — coupled with the historic tradition of banning machine guns, combine to reasonably support the conclusion that HB 5043 is consistent with and

[4] Preliminarily, the Court notes that this decision and order addresses only Plaintiffs' challenge to HB 5043 as unconstitutional under the Second Amendment. The Court does not, because it need not, take up the question of whether the Glock SlimLine or Series VI firearms fall outside the scope of the statute. But Defendants' counsel has represented that this assessment is underway and the Court is optimistic (because it is in all parties' best interest) that a decision will be forthcoming.

[5] For purposes of analysis, the Court refers to Plaintiffs and Defendants collectively in both cases.

"relevantly similar" to these historical analogues. *See Glock, Inc.*, No. 26-cv-1525, Opp'n, ECF No. 26 at 22; *Nat'l Shooting Sports Found. Inc.*, No. 26-cv-1528, Opp'n, ECF No. 39 at 21.

Defendants identify several "proving laws" from the time of the founding. Specifically, Defendants rely on laws from Pennsylvania, New Jersey, and New Hampshire that required firearms to meet certain manufacturing and inspection specifications before they could be sold. *See Glock, Inc.*, *id*. at 24; *Nat'l Shooting Sports Found. Inc.*, *id*. at 24. And Massachusetts enacted a law "that required an inspection of all firearms manufactured in the state before they could be sold." *Granata v. Campbell,* 798 F.Supp.3d 46, 61 (D. Mass. 2025). The law not only required that the firearm be tested to make sure it was safely operable, but also required that the firearm be stamped with a "proof mark" so that the testing and inspection were well documented. *Id*. Thus, Defendants argue the "why" of these regulations was to ensure that the firearms were safe before being sold, and the "how" was the inspection process itself. In combination with the historical tradition of banning machine guns, Defendants argue HB 5043 passes constitutional muster.

In response, Plaintiffs assert that the ban on the sale of certain firearms, because they can be converted by nefarious actors into fully automatic firearms, is actually *inconsistent* with the historical traditions of firearms regulation in this country. *See Glock, Inc.*, No. 26-cv-1525, Mot. for TRO, ECF No. 3-1 at 28; *Nat'l Shooting Sports Found. Inc.*, No. 26-cv-1528, Reply, ECF No. 40 at 4–5. Specifically, the Plaintiffs argue that the tradition of firearms regulation in this country is to outlaw modification of legal firearms into illegal ones. *See Glock, Inc.*, *id*. at 25; *Nat'l Shooting Sports Found. Inc.*, *id*. at 4. For example, when confronted with the dangerousness of a "sawed-off shotgun" the response was to ban the modified shotgun, not to ban shotguns altogether. *See Lamont*, 153 F.4th at 246 (citing *United States v. Miller*, 307 U.S. 174, 178 (1939)). And, Plaintiffs point out, machinegun conversion devices ("MCDs") are already illegal, consistent

with the historical tradition of regulating machine guns, as is it illegal to sell or possess a semiautomatic firearm that has been converted through use of an MCD. *See Glock, Inc.*, *id*. at 33; *Nat'l Shooting Sports Found. Inc.*, Mot. for TRO, ECF No. 4-1 at 17.

Defendants' argument is not without some force. But the Court concludes that reliance on the proving laws, even when viewed through the lens of a legitimate regulation of machine guns, *at this juncture*, does not adequately rebut the presumption that the statute is unconstitutional under the Second Amendment. The Court agrees that this outcome may derive from the condensed time frame within which these issues have been presented and upon further development of the record, the outcome may well be different.[6] But Defendants' reliance on the proving laws would require, or at least suggest, that the firearms described in HB 5043, might be unsafe *at the point of sale*. Each of the proving laws discussed were designed to ensure safety before the firearm enters the stream of commerce. They were not designed to, and indeed could not, forestall future misuse of the firearm (even if predictable) after it enters the stream of commerce. Here, there is no dispute that handguns with a cruciform trigger bar (in an unconverted state) are not only safe, but extremely popular for purposes of self-defense, and their possession and carry rights are protected by the Second Amendment. *See*, *e.g.*, *Heller*, 554 U.S. at 624–25 (Observing that "[i]n the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." (second alteration in original) (citation omitted)); *Lamont*, 153 F.4th at 242 (In affirming denial of preliminary injunctive relief as to statute banning certain assault style weapons and large capacity magazines, noting that "Connecticut residents

[6] Plaintiffs and Defendants each assert that the other is responsible for this condensed and hurried time frame. The Court assigns no such blame to any party. The Attorney General was clearly on notice that this challenge would be filed if ongoing discussions as to the applicability of the statute to certain of Glock's firearms could not be resolved. That he elected not to advise his staff who would be tasked with defending against that challenge cannot be laid at the feet of the Plaintiffs. And Plaintiffs could have filed this action sooner, during those discussions, so as to avoid this unfortunate time crunch on the eve of the effective date of the statute.

remain able to . . . own and possess popular semiautomatic handguns like the Glock 17[.]"). Thus, the proving laws do not appear to sufficiently align with either the "how" or the "why" of HB 5043 so as to render them relevantly similar. Finally, in advancing this argument, the Defendants offer no adequate explanation as to how the sale of a firearm manufactured on September 30, 2026 needs no safety regulation but the same firearm manufactured 24 hours later is sufficiently dangerous so as to be properly restricted and regulated by the state.

Accordingly, on the present record, the Court concludes that Plaintiffs have met their burden of establishing a likelihood of success on the merits. The statute is presumptively unconstitutional, and Defendants have not met their burden of demonstrating that the statute is consistent with our nation's history of firearms regulation.

***Irreparable Harm***

The parties also have very divergent views as to whether there is imminent irreparable harm to Plaintiffs. On balance, the Court concludes that Plaintiffs have met their burden of establishing that if enforcement of the statute is not enjoined, they will suffer such harm.

Defendants' first argue that the statute only applies to certain firearms manufactured after October 1, 2026, and thus Plaintiffs are able to continue to sell their stockpile of semi-automatic cruciform trigger handguns after October 1, 2026. *See Glock, Inc.*, Opp'n, ECF No. 26 at 8; *Nat'l Shooting Sports Found. Inc.*, Opp'n, ECF No. 39 at 31–32. That is true, and not in dispute. But it does not end the inquiry. Defendants also assert that the eleventh-hour filing of these motions demonstrates that any potential harm is neither imminent nor irreparable. *See Glock, Inc.*, *id*; *Nat'l Shooting Sports Found. Inc.*, *id*. at 8. As noted above, all parties bear some responsibility for the late filing of these motions and so the Court draws no inference against Plaintiffs on the issue of

irreparable harm. Finally, Defendants argue that Plaintiffs' concerns are too speculative to support the issuance of preliminary injunctive relief. *See Nat'l Shooting Sports Found. Inc.*, *id*. at 29–30.

Plaintiffs respond to the first argument by submitting a Supplemental Declaration on behalf of Plaintiff Blue Trail Range Corporation, which reveals that it has approximately $25,000 worth of cruciform trigger handguns and expects to have that inventory depleted by the end of October 2026. *Nat'l Shooting Sports Found. Inc.*, Ex. D, ECF No. 40-1 at ¶ 4. The Declaration further asserts that Blue Trail Range Corporation has made the decision to stop importing, from Plaintiff Shadow Systems or other manufacturers, new cruciform-trigger handguns and, in fact, has already stopped placing orders for any such handguns because of HB 5043. *Id*. at ¶ 5.

Plaintiffs also argue that the existence of pre-October 1, 2026 manufactured firearms in their inventory (or in the case of NSSF their members' inventory) does not address the concern identified by all Plaintiffs regarding the loss of a significant customer base, *i.e.*, law enforcement personnel who are not exempted under the statute; the commensurate loss of good will; the disruption to current and anticipated contractual obligations; the stifling impact on their ability to advertise their products; the impracticality of carving Connecticut out of its advertising audience and perhaps most importantly, the impact upon Connecticut citizens whose Second Amendment rights are likely violated by HB 5043. *See Glock, Inc.*, Mot. for TRO, ECF No. 3-1 at 14–15, 31. And as noted by Plaintiffs, although in *Lamont*, 153 F. 4th at 248, the Second Circuit left open the question of whether a Second Amendment violation is, *de facto*, irreparable harm, other courts to consider the issue have held that it is. *See*, *e.g.*, *Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025). In combination, the Court concludes that if not enjoined, enforcement of HB 5043 will cause irreparable harm to Plaintiffs.

The Court has considered the parties' substantial submissions as well as the concededly rigorous requirements for the issuance of injunctive relief, where, as here the request is for "prohibitory" relief insofar as it serves to maintain the status quo until such time as the issues may be fully developed and adjudicated. And although the Court has not herein addressed every issue raised and argued in the submissions, it has considered them all.

**Conclusion**

Having concluded that Plaintiffs have demonstrated that they are likely to succeed on the merits of their Second Amendment challenge to HB 5043; that Plaintiffs have demonstrated the likelihood that they will suffer irreparable harm if enforcement of the statute is not enjoined; and that the other factors to be weighed when considering the issuance of injunctive relief favor such relief, Plaintiffs' Motions for Preliminary Injunctive Relief are **GRANTED**. A separate Order shall enter.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of September 2026.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE