**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC.; SHADOW SYSTEMS LLC; and BLUE TRAIL RANGE CORPORATION;<br><br>Plaintiffs,<br><br>v.<br><br>PATRICK J. GRIFFIN, in his official capacity as Chief State's Attorney; JOHN P. DOYLE, JR., in his official capacity as State's Attorney for the Judicial District of New Haven; MARGARET E. KELLEY, in her official capacity as State's Attorney for the Judicial District of Ansonia/Milford; JOSEPH T. CORRADINO, in his official capacity as State's Attorney for the Judicial District of Bridgeport; STACEY MIRANDA, in her official capacity as State's Attorney for the Judicial District of Danbury; SHARMESE L. WALCOTT, in her official capacity as State's Attorney for the Judicial District of Hartford; DAVID R. SHANNON, in his official capacity as State's Attorney for the Judicial District of Litchfield; MICHAEL A. GAILOR, in his official capacity as State's Attorney for the Judicial District of Middlesex; CHRISTIAN M. WATSON, in his official capacity as State's Attorney for the Judicial District of New Britain; PAUL J. NARDUCCI, in his official capacity as State's Attorney for the Judicial District of New London; DAVID R. APPLEGATE, in his official capacity as State's Attorney for the Judicial District of Stamford-Norwalk; CRAIG P. NOWAK, in his official capacity as State's Attorney for the Judicial District of Tolland; MAUREEN PLATT, in her official capacity as State's Attorney for the Judicial District of Waterbury; and JOHN F. FAHEY, in his official capacity as State's Attorney for the Judicial District of Windham;<br><br>Defendants. | Civil Action No. 3:26-cv-1528 KAD<br><br>November 19, 2026 |

## VERIFIED AMENDED COMPLAINT

The National Shooting Sports Foundation, Inc. ("NSSF"), Shadow Systems LLC, and Blue Trail Range Corporation bring this civil action seeking declaratory and injunctive relief against the Chief State's Attorney of Connecticut and the State's Attorney for each Judicial District.

## INTRODUCTION

1. Semiautomatic handguns "are, in fact, 'the quintessential self-defense weapon.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)). And semiautomatic handguns equipped with cruciform trigger bars are, in fact, the quintessential handgun. Pioneered by Austrian inventor Gaston Glock in the 1980s, the cruciform-trigger design revolutionized the handgun market on both sides of the Atlantic: By integrating multiple firearm components into a single part, the cruciform-trigger design resulted in a handgun that is less expensive to produce, easier to maintain, less susceptible to component failure or debris infiltration, and—critically—less likely to accidentally discharge. *See* Elwood Shelton, *Best Concealed Carry Guns in 2026 [Field Tested]*, Gun Digest (May 22, 2026), https://perma.cc/39AJ-W396 (describing cruciform-trigger handguns as "almost boringly reliable" "thanks to a painfully simplistic design that offers few opportunities for malfunctions to occur"). That explains why, once Glock's patents expired, manufacturers like plaintiff Shadow Systems LLC began producing and selling their own cruciform-trigger handguns using the same basic design. It also explains why, for retailers like plaintiff Blue Trail Range Corporation, selling cruciform-trigger handguns to law-abiding citizens is big business: Every year, hundreds of thousands of these common arms are made in the United States and sold not just to law-abiding civilians seeking to use them for self-defense, but also to law enforcement officers, including (since 2022) every Connecticut State Trooper.

2. Although they are overwhelmingly used for lawful purposes, these handguns may,

like "virtually any semiautomatic weapon," unlawfully "be converted … by internal modification … into a machinegun" capable of full-automatic functionality—i.e., continuously firing rounds for as long as the trigger is actuated, instead of the standard one-round-per-trigger-pull. *Staples v. United States*, 511 U.S. 600, 615 (1994). That has understandably led the federal government and many states, including Connecticut, to criminalize possession of handguns that have been modified in that manner, as well as the aftermarket conversion devices—commonly known as pistol "switches"—that criminals use to accomplish the modification. But despite the omnipresent potential for illegal modification to an automatic firearm, the Supreme Court has been unequivocal that the underlying semiautomatic firearms remain "lawful" to "possess[]." *Id.* at 612. That is because "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" full stop. *Bruen*, 597 U.S. at 21. Efforts to ban "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose"—such as cruciform-trigger handguns—thus "[f]ail constitutional muster" under "any" "standard." *Heller*, 554 U.S. at 628-29.

3. A new Connecticut law flouts those principles and precedents. Starting October 1, Substitute House Bill No. 5043 ("HB5043") makes it a felony to sell any of the market-leading cruciform-trigger handguns. Never mind if law-abiding Connecticut residents with a concealed-carry permit want to buy one of *Gun Digest*'s best concealed-carry guns of 2026. *See* Shelton, *supra*. Never mind if law-abiding Connecticut residents seeking to engage in recreational target shooting want to buy one of the top five best-selling handguns. *See* Palmetto State Armory, *Top 5 Best-Selling Handguns of 2026 (So Far)*, https://perma.cc/2N35-4GB2 (describing cruciform-trigger handguns as "prolific," "unsurpassed," and "the perfect balance of precision and reliability"). Never mind that, last year alone, sales of cruciform-trigger handguns generated tens

of millions of dollars in revenue for manufacturers like Shadow Systems, and tens of thousands of dollars in revenue for retailers like Blue Trail Range. After October 1, Connecticut retailers must remove all new cruciform-trigger handguns from their shelves or subject their principals to five years in prison, unless and until manufacturers change a design that law-abiding citizens overwhelmingly prefer for its safety, reliability, and accessibility.

4. That law lacks any historical analogue—and the logic underlying it lacks any limit. If Connecticut can ban cruciform-trigger handguns because of the risk that criminals can convert them into fully automatic machine guns, then it could ban "virtually any semiautomatic weapon" for the same reason, *Staples*, 511 U.S. at 615, even though semiautomatic weapons are "the weapons most commonly used today for self-defense," *Caetano v. Massachusetts*, 577 U.S. 411, 417-18 (2016) (Alito, J., concurring in the judgment). *Accord Snope v. Brown*, 145 S.Ct. 1534, 1534 (2025) (Kavanaugh, J., respecting the denial of certiorari) (noting that "most handguns" today "are semi-automatic"). And it does not stop with semiautomatic weapons. If Connecticut can ban cruciform-trigger handguns because criminals can use household tools to modify them into uncommon and unlawful guns, then Connecticut could ban hunting rifles and shotguns for the same reason: Criminals have been using hacksaws to turn them into illegal short-barreled firearms since long before the days of Bonnie and Clyde. In short, if Connecticut can ban cruciform-trigger handguns because of the sheer potential to convert them into something illegal, then it is hard to see what class of firearm it could not ban.

5. None of that is consistent with the Second Amendment. To be sure, states have broad authority to regulate "dangerous and unusual weapons," *Heller*, 554 U.S. at 627, which is why they may ban the relatively small number of handguns that have been unlawfully converted into fully automatic firearms. But if a firearm is "in common use at the time," then it is plainly

not "highly unusual in society at large." *Bruen*, 597 U.S. at 47. And the mere fact that a firearm that is typically possessed by law-abiding citizens for lawful purposes can be altered to become dangerous and unusual does not make the *unaltered* firearm less commonly used for lawful purposes. It has always been easy for landowners to convert common firearms into dangerous and unusual booby traps to ambush intruders, or for criminals to saw off the barrels of common shotguns to turn them into illegal short-barreled firearms. But our Nation's tradition has always been one of criminalizing the modification and prosecuting the modifiers, not taking the unmodified firearm away from those who seek to keep and bear it for lawful purposes. That was true at the Founding, and it remains true today. *Compare*, *e.g.*, 1771 N.J. Laws 346, §10 (prohibiting the "most dangerous" practice of setting guns to discharge by "string, rope or other contrivance" and requiring "such person or persons [to] forfeit and [either] pay the sum of six pounds" or "be committed to the common gaol of the county[] for six months"), *with*, *e.g.*, 21 U.S.C. §841(d) (similar).

6. Just so here. Connecticut may ban the parts used to interfere with cruciform-trigger handgun's intended semiautomatic functioning. (In fact, it already has. *See* Conn. Gen. Stat. §53-206g.) It may aggressively prosecute both those who do the illicit modifying and those who supply the illicit parts to aid it. And it may mobilize all manner of resources to educate the public about this important public-safety issue. But it cannot drive "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose" off the market. *Heller*, 554 U.S. at 628. *Heller* was clear: It is not "permissible to ban the possession of handguns so long as the possession of other firearms … is allowed." *Id.* at 629.

7. HB5043 is incompatible with our Nation's historical tradition of firearm regulation. The Court should declare it unconstitutional and enter an order preliminarily and permanently

enjoining its implementation and enforcement.

## PARTIES

8. Plaintiff **NSSF** is a non-profit, tax-exempt, non-stock corporation with its principal place of business in Shelton, Connecticut. It serves as the leading trade association for the firearm, ammunition, and hunting and shooting sports industries, with a membership of approximately 10,000 that includes manufacturers, distributors, and retailers of firearms, ammunition, and related products, including manufacturers, distributors, and retailers based in Connecticut. NSSF's mission is to promote, protect, and preserve hunting and shooting sports by addressing industry challenges; to advance participation in and understanding of hunting and shooting sports; to reaffirm and strengthen its members' commitment to the safe and responsible sale and use of their products; and to promote support for America's traditional hunting and shooting heritage and firearm freedoms.

9. NSSF is also a committed law-enforcement partner. For decades, it has collaborated with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on an anti-straw-purchasing campaign known as "Don't Lie for the Other Guy." *See NSSF, ATF Celebrate 25 Years of Partnership*, NSSF (Sept. 15, 2025), https://perma.cc/WYS9-FYN8. It also partners with ATF to deter and prevent "smash-and-grab" burglaries and robberies of firearm retailers through a program known as "Operation Secure Store." *See Operation Secure Store*, NSSF (2026), https://perma.cc/ZV4A-3PKF. And in response to "increasing numbers of illegal [machinegun conversion devices] recovered at crime scenes," NSSF has launched and devoted money, manpower, and other resources to its "Right Side of Legal" educational campaign, warning firearm owners that "[m]odifying a firearm by adding an illegal device that overrides the original, intended function or design to render a semiautomatic firearm into an automatic firearm is a felony." *See Right Side of Legal*, NSSF (2026), https://perma.cc/D4RU-BPRR ("Illegally modify

a gun, face the time: Full auto means full consequences.”).

10. Shadow Systems and Blue Trail Range are both NSSF members. NSSF’s membership also includes several other manufacturers who specialize in manufacturing and designing cruciform-trigger handguns. In addition to Shadow Systems, these members include Glock, Derya, Ruger, Palmetto State Armory, and Beretta (including through its affiliate Stoeger). All of these manufacturers make and sell a substantial number of cruciform-trigger handguns annually, including to customers in Connecticut as well as nationwide.

11. Plaintiff **Shadow Systems** is one of the leading U.S. producers of 9mm cruciform-trigger handguns. Founded in 2016, Shadow Systems quickly grew from a small start-up into a nationally distributed firearms manufacturer led by a West Point graduate with its own state-of-the-art facility in Plano, Texas featuring proprietary (and reliability-enhancing) manufacturing technology—making it one of the few manufacturers to offer a fully made-in-America firearm with unparalleled quality. Its commitment to delivering the most price-competitive, highest-value pistols and parts on the market has led it to become a leading supplier of self-defense and recreational handguns to law-abiding citizens, as well as a supplier to over 350 law-enforcement agencies. Although cruciform-trigger handguns comprise Shadow Systems’ original, best-known, and most commercially successful product line by a significant margin, the business has recently expanded into rifles, optics, and other related products.

12. From 2021 through last month, Shadow Systems has shipped over $204 million of product to retailers nationwide—the overwhelming majority of which is cruciform-trigger handguns. Over the same period, it has sold over $530,000 of cruciform-trigger handguns into Connecticut, averaging over $100,000 of Connecticut sales annually.

13. Laws banning cruciform-trigger handguns represent an existential threat to Shadow

Systems' business. One of the only analogs for HB5043 is a 2025 California law that likewise sought to ban most new cruciform-trigger handguns—though to California's minimal credit, its law did not sweep nearly as far as HB5043. *Cf.* Cal. Penal Code §27595(a) (citing Cal. Penal Code §16885). Nonetheless California's law was enough to drive Shadow Systems from the Golden State entirely—a loss of nearly $3.8 million of annual revenue, and 11% of Shadow System's overall business.

14. Plaintiff **Blue Trail Range** is one of New England's best known and best regarded firearm facilities. *See, e.g.*, *Blue Trail Range Receives NSSF Four-Star Range Rating*, NSSF (June 14, 2023), https://perma.cc/3KUT-F8HW. Founded in 1945 as an offshoot of a World-War-II-era optics manufacturer, Blue Trail Range has been owned and operated by the Lyman family for over eight decades; its day-to-day operations are overseen by a retired Connecticut Conservation Enforcement Officer who also served as an adjunct instructor at the Connecticut Police Academy. Blue Trail Range's Wallingford facility boasts the only public outdoor shooting range in the area, as well as an indoor shooting range, retail firearm store, state-of-the-art training center, and event space. That facility serves as the practice venue for multiple area high-school rifle teams, as well as the competition venue for the Connecticut high school state rifle championship and rifle events in the Nutmeg State Games. Blue Trail Range also routinely offers pistol and long-gun permit classes, self-defense training, and firearms-safety courses for adults and juniors alike. In addition to those training courses, Blue Trail Range hosts various recreational leagues designed to safely introduce Connecticut residents of all ages to the shooting sports. Blue Trail Range is an active member of both the Better Business Bureau and the Connecticut Business & Industry Association, as well as a 2025 recipient of the Quinnipiac Chamber of Commerce's small business award.

15. Blue Trail Range is also a committed law-enforcement partner. Once a year, it

invites ATF to put on training sessions for its retail staff to improve vetting of customers. As an NSSF member, Blue Trail Range also participates in NSSF's "Don't Lie for the Other Guy" initiative to combat illegal straw purchasing, as well as NSSF's biennial safe firearm storage initiative. And it frequently sells firearms, ammunition, and accessories to various law-enforcement officers for on- and off-duty use.

16. As a retailer, Blue Trail Range is committed to doing business in an ethical and professional manner. Its employees are instructed to get to know their customers and to ensure that they are selling the right guns to the right people—especially when they know or suspect that a customer is buying his or her first firearm. This practice includes asking the customer about his/her intended use of the firearm, reviewing basic firearm safety, and going over proper firearm use, from loading and unloading to disassembly and cleaning. Blue Trail Range also routinely recommends that customers take a firearms safety course for further safety instruction and skill development. During these conversations, Blue Trail Range is not only getting to know its customers, but also evaluating their maturity and state of mind (and/or whether they are potential straw purchasers). And at the risk of stating the obvious, Blue Trail Range never sells a firearm to a customer without conducting any and every background check required by law.

17. A substantial portion of Blue Trail Range's retail business comprises sales of cruciform-trigger handguns and related accessories. In each of the past three years, Blue Trail Range has sold on average roughly 10 cruciform-trigger handguns made by Shadow Systems.

18. Defendant **Patrick J. Griffin** is Connecticut's Chief State's Attorney. As Chief State's Attorney and head of the Division of Criminal Justice, Griffin is "in charge of the investigation and prosecution of all criminal matters." Conn. Const., art. IV, §27; *see* Conn. Gen. Stat. §51-277. Griffin is a resident of Connecticut, and his principal place of business is in Rocky

Hill. At all relevant times, Defendant Griffin, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Griffin in his official capacity.

19. Defendant **John P. Doyle, Jr.** is the State's Attorney for the New Haven Judicial District, which encompasses Wallingford. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Doyle is a resident of Connecticut, and his principal place of business is in New Haven. At all relevant times, Defendant Doyle, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Doyle in his official capacity.

20. Defendant **Margaret E. Kelley** is the State's Attorney for the Ansonia/Milford Judicial District. As State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Kelley is a resident of Connecticut, and her principal place of business is in Ansonia/Milford. At all relevant times, Defendant Kelley, as well as those subject to her supervision, direction, or control, act under color of state law. Plaintiffs sue Kelley in her official capacity.

21. Defendant **Joseph T. Corradino** is the State's Attorney for the Bridgeport Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Corradino is a resident of Connecticut, and his principal place of business is in Bridgeport. At all relevant times, Defendant Corradino, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Corradino in his official capacity.

22. Defendant **Stacey Miranda** is the State's Attorney for the Danbury Judicial District. As State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Miranda is a resident of Connecticut, and her principal place of business is in Danbury. At all relevant times, Defendant Miranda, as well as those subject to her supervision, direction, or control, act under color of state law. Plaintiffs sue Miranda in her official capacity.

23. Defendant **Sharmese L. Walcott** is the State's Attorney for the Hartford Judicial District. As State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Walcott is a resident of Connecticut, and her principal place of business is in Hartford. At all relevant times, Defendant Walcott, as well as those subject to her supervision, direction, or control, act under color of state law. Plaintiffs sue Walcott in her official capacity.

24. Defendant **David R. Shannon** is the State's Attorney for the Litchfield Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Shannon is a resident of Connecticut, and his principal place of business is in Litchfield. At all relevant times, Defendant Shannon, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Shannon in his official capacity.

25. Defendant **Michael A. Gailor** is the State's Attorney for the Middlesex Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate

presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Gailor is a resident of Connecticut, and his principal place of business is in Middlesex. At all relevant times, Defendant Gailor, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Gailor in his official capacity.

26. Defendant **Christian M. Watson** is the State's Attorney for the New Britain Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Watson is a resident of Connecticut, and his principal place of business is in New Britain. At all relevant times, Defendant Watson, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Watson in his official capacity.

27. Defendant **David R. Applegate** is the State's Attorney for the Stamford/Norwalk Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Applegate is a resident of Connecticut, and his principal place of business is in Stamford. At all relevant times, Defendant Applegate, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Applegate in his official capacity.

28. Defendant **Paul J. Narducci** is the State's Attorney for the New London Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Narducci is a resident of

Connecticut, and his principal place of business is in New London. At all relevant times, Defendant Narducci, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Narducci in his official capacity.

29. Defendant **Craig P. Nowak** is the State's Attorney for the Tolland Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Nowak is a resident of Connecticut, and his principal place of business is in Tollan. At all relevant times, Defendant Nowak, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Nowak in his official capacity.

30. Defendant **Maureen Platt** is the State's Attorney for the Waterbury Judicial District. As State's Attorney, she is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Platt is a resident of Connecticut, and her principal place of business is in Waterbury. At all relevant times, Defendant Platt, as well as those subject to her supervision, direction, or control, act under color of state law. Plaintiffs sue Platt in her official capacity.

31. Defendant **John F. Fahey** is the State's Attorney for the Windham Judicial District. As State's Attorney, he is required to "diligently inquire after and make appropriate presentment and complaint to the Superior Court of all crimes and other criminal matters within the jurisdiction of the court." Conn. Gen. Stat. §51-286a(a). Defendant Fahey is a resident of Connecticut, and his principal place of business is in Windham. At all relevant times, Defendant Fahey, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue

Fahey in his official capacity.

## JURISDICTION AND VENUE

32. This Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343 because Plaintiffs allege that HB5043 violates the U.S. Constitution and seek relief under 42 U.S.C. §1983.

33. Venue is proper in this District under 28 U.S.C. §1391 because Defendants reside here as a matter of law, and because a substantial part of the events or omissions giving rise to the claim occurred here.

## BACKGROUND

### I. Cruciform-Trigger Handguns Are "America's Gun."

34. It is hard to overstate the impact that Austrian inventor Gaston Glock had on the handgun market when he unveiled the cruciform-trigger design in 1982. As one rival manufacturer put it, Glock's design "became the next generation of how the entire world makes handguns": "Every single manufacturer from the pre-Glock era now makes a post-Glock era [cruciform-trigger] handgun." Frank Koppenhagen et al., *The Genesis of the Glock Pistol: How Gaston Glock Created the Dominant Design for Handguns* 1-2 (2025), https://perma.cc/7YEJ-YJTQ.

35. Although Glock had no training in firearm design, he was able to resolve a contradiction that had confounded other manufacturers: how to "combin[e] the firepower and rapid reload capability of" many "semiautomatic pistols" with "the safety and operational simplicity of" the leading "double-action revolvers" of the day. *Id.* at 2, 5, 24-25; *see also* CBS News, *How Glock Became America's Gun* (Sept. 15, 2013), https://perma.cc/6EXT-YBH6 [hereinafter *America's Gun*]. At the time, double-action revolvers—so-named because a single pull of the trigger both cocks and releases the firearm's hammer—typically held only six cartridges, took significant time to reload, and had "a long, heavy trigger pull" that was a mixed

blessing: It "ma[d]e[] it virtually impossible to accidentally discharge the gun," but also "ma[d]e[] rapid and precise shooting more challenging" in self-defense situations. Koppenhagen et al., *supra*, at 5-6. By contrast, the then-predominant semiautomatic pistols used a "double-action/single-action" design: "The first shot, fired in double-action mode, require[d] a longer and heavier trigger pull, as the trigger must both cock and release the hammer. All subsequent shots [we]re fired in single-action mode," with "a shorter and lighter trigger pull." *Id.* at 6. Although those double-action/single-action semiautomatic pistols held significantly more cartridges than double-action revolvers, the "transition between different trigger pull weights" "negatively impact[ed] accuracy and shot consistency," and the design "required" "additional operating steps" that "complicate[d] the safe operation of the gun and pose[d] potential sources of operating errors, particularly in high stress conditions." *Id.*

36. Glock's revolutionary design resulted in "a pistol that, once chambered, remains both ready to fire and safe to carry at all times, with a consistent trigger pull optimized for both safety and performance." *Id.* at 5. The key innovation was the so-called cruciform "trigger bar capable of movement in two non-parallel directions," a capability that enables it to "perform[] three functions that were traditionally carried out by separate components" in prior handgun designs. *Id.* at 9, 12; *see also id.* at 13-17 (explaining the more technical aspects of the mechanics); Matt Rittman, *How a Glock Works* (July 2, 2019), https://bit.ly/4wHWaOi. Because the cruciform design allows for "stamp[ing]" instead of "machin[ing]," it is also more "cost-effective" to "mass produc[e]." Koppenhagen et al., *supra*, at 20-21. As Glock put it in his original U.S. patent:

> Handling of the pistol according to the instant invention is therefore as simple as possible. The pistol is ready after chambering of the cartridge in the barrel for shooting at any time and is nonetheless completely safe from unintentional shots. Similarly in this condition the pistol is fully drop- and jar-resistant. As a result of the unchanging trigger force accuracy is increased. Simple and safe handling of the pistol is ensured even for the unpracticed user.

*Id.* at 9; *see id.* at 18 (schematic comparing operational steps for Glock versus other common firearm design). And with "significantly fewer parts" "than all competing products at the time," the cruciform-trigger pistol is "significantly simpl[er]" to maintain" and "demonstrate[d] … significantly higher" "reliability." *Id.* at 21; *see also* CBS, *America's Gun* (observing that cruciform-trigger handguns have "only 34 components—about half of most other makers," "ma[king] the gun easier to manufacture, and less likely to malfunction").

37. The cruciform-trigger design also allows for three sequential passive safeties, each operating independently—a groundbreaking advancement when it comes to preventing accidental discharges:




GLOCK, *Our Safe Action® System* (2026), https://perma.cc/4GZG-DPMQ (red annotation added). *First*, a safety lever integrated into the trigger blocks unintentional "rearward movement of the trigger":







Koppenhagen et al., *supra*, at 13-15. *Second*, the design of the cruciform trigger bar makes it physically impossible for the firing pin to strike the cartridge unless and until the shooter actuates the cruciform trigger bar by pulling the trigger:

**Rest State**




**Lifted up by trigger bar**




*Id.* at 15. *Third*, the design of the cruciform-trigger bar makes it impossible for the firing pin to release without the shooter actuating the cruciform trigger bar:




*Id.* at 14. *See generally* Rittman, *supra*. The cruciform trigger bar's innovative design is what makes it possible to combine these redundant safeties into one integrated component, rather than relying on multiple subcomponents to work together in ways that make the firearm more susceptible to component failure or manufacturing defects.

38. That "unique balance" of safety, "performance[,] and value" has made cruciform-trigger handguns "wide[ly] popular[]" for countless "armed citizens, competition shooters, collectors, and general firearms enthusiasts." Kyle Clouse, *Is Glock Still the King of Semi-Auto Pistols?*, Liberty Safe (Jun. 13, 2025) https://perma.cc/TV8E-HZJ7; *see also* CBS, *America's Gun* (deeming cruciform-trigger handguns "a lawnmower as far as reliability goes"). Firearms produced by Glock's eponymous company alone have consistently accounted for up to "65% market share of the handguns in the U.S." Forbes, *Gaston Glock & Family* (2026), https://perma.cc/AV67-93M4; *see* Clouse, *supra* ("[M]ore Glock pistols have been sold than any other handgun ever made, with recent estimates numbering total Glock sales topping the 20 million mark globally."). And now that the patent on Glock's cruciform-trigger bar has expired, an entire industry of manufacturers has cropped up "mak[ing] their own versions of Glock pistols," Clouse, *supra*, i.e., their own version of cruciform-trigger pistols.

39. When it comes to so-called "Glock clone" manufacturers, Shadow Systems "is certainly one of the best in its class." Brad Fitzpatrick, *Top Glock Clones U.S. Buyers Are Raving*

*About* (Mar. 12, 2026), https://perma.cc/4V65-Y6Y4 (listing, among others, the Shadow Systems MR920, and noting that Shadow Systems "produces some of the best handguns on the market" with "a lot of great features" making them both "well designed and rugged" as well as "extremely accurate and ultra reliable"); *see also* Paul Peterson, *7 Best Glock Clones for Any Budget: Buyer's Guide*, Guns.Com (Feb. 20, 2025), https://perma.cc/DK5C-NN2U (identifying Shadow Systems as manufacturing "a family of premium Glock clones" "all carry[ing] a Glock's basic DNA but with some serious genetic modifications" that "pa[y] particular attention to how a shooter's hand engages with the" pistol). As those market-leading reviews suggest, Shadow Systems guns are popular with, and commonly used by, law-abiding citizens both in and out of Connecticut, as both its and Blue Trail Range's sales figures corroborate. *See supra* ¶¶12, 17.

40. As a class, well over 500,000 cruciform-trigger handguns are manufactured for sale in the United States annually. *See, e.g.*, ATF, *Annual Firearms Manufacturing & Export Report* 15, 51, 201-02 (2024), https://perma.cc/ZCU6-WWR2. By any measure, and as the federal government has acknowledged across multiple administrations, cruciform-trigger handguns are "popular for civilian use." 87 Fed. Reg. 24,652, 24,655 (Apr. 26, 2022); *see also Bianchi v. Brown*, 111 F.4th 438, 455 (4th Cir. 2024) (en banc) (referring to a cruciform-trigger handgun as a "commonly used handgun"); *id.* at 527 (Richardson, J., dissenting) (similar).

41. While safety, reliability, and affordability help explain why cruciform-trigger handguns have become the handgun of choice for law-abiding citizens, they are decidedly *not* the firearm of choice for criminals. Quite the contrary: ATF data tracking "weapons recovered at crime scenes" dispels any suggestion that cruciform-trigger handguns are "distinctively used" by criminals "more than other guns." CBS, *America's Gun* ("The notion that every gangster in every city is walking around with a Glock just isn't true.").

42. That said, "one of the most prominent emerging public and law enforcement officer safety threats in recent years has been the proliferation of illegal" machine gun conversion devices ("MCD"). *Right Side of Legal*, *supra*. "MCDs include traditional 'Drop in Auto Sears,' which are designed for use on AR-type firearms," *id.*—i.e., "the most popular rifle in the country" among law-abiding citizens, *Smith & Wesson Brands v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025). MCDs also include "more recently developed 'switches,' which are designed for use on" cruciform-trigger handguns. *Right Side of Legal*, *supra*; *see* ATF, *Machinegun Conversion Devices: Fact Sheet* (Dec. 12, 2024), https://perma.cc/LD8J-GRB4.

**II. HB5043 Bans Sales Of New Common Cruciform-Trigger Handguns After October 1.**

43. For decades, lawmakers have responded to the threat of MCDs by criminalizing the MCDs themselves, as well as firearms equipped with them. Federal law, for instance, criminalizes "machinegun" possession, *see* 18 U.S.C. §922(o), and defines "machinegun" as "any" fully automatic weapon, as well as "any part designed and intended … for use in converting a weapon into a machinegun," 26 U.S.C. §5845. Section 53-206g of the Connecticut General Statutes likewise criminalizes possession of any "rate of fire enhancement," which is defined to include "any device, component, part, combination of parts, attachment or accessory that … causes a semiautomatic firearm to fire more than one round per operation of the trigger."

44. But as the Supreme Court noted in *Staples v. United States*—itself a case about an illegally modified, fully automatic AR-15—unmodified semiautomatic firearms have always remained "lawful" to "possess[]." 511 U.S. at 612.

45. HB5043 breaks that unbroken tradition "by prohibiting the future sale of new [cruciform-trigger] handguns." Statement of Governor Ned Lamont, *Testimony For Bill Number HB-05043 In All Committees*, https://perma.cc/9RNV-9WUF. Effective October 1, 2026, HB5043 makes it "a class D felony" for "[a]ny individual or firm, partnership, corporation, limited liability

company, association or other similar entity" to "knowingly import[] into this state or knowingly advertise[], sell[], offer[] or expose[] for sale any convertible pistol … manufactured on or after October 1, 2026." A class D felony is punishable by up to five years imprisonment and a fine of up to $5,000. Conn. Gen. Stat. §§53a-35a(8), 53a-41(4). A copy of HB5043 is attached as Exhibit A.[1]

46. HB5043 defines "convertible pistol" as "any semiautomatic pistol with a cruciform trigger bar that can be readily altered by hand or with a common household tool so that the pistol can be readily converted into a machine gun by the installation or attachment of a pistol converter." Ex.A at 2. A pistol converter is in turn defined as "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, interferes with the trigger mechanism, thereby enabling the pistol to discharge a number of shots or bullets rapidly or automatically with one continuous pull of the trigger." Ex.A at 3.

47. The only way for a cruciform-trigger handgun to fall outside HB5043's definition of "convertible pistol" is if it "has a tab or other piece of material molded to the pistol's frame" that cannot "be readily removed" and "that shields the cruciform trigger bar from … a pistol converter." Ex.A at 2. None of the popular cruciform-trigger handguns currently made by Shadow Systems has this feature.

48. Changing the well-known cruciform-trigger design to conform to Connecticut's preferences would cost Shadow Systems substantial time and money. And there is no guarantee that law-abiding consumers who have come to overwhelmingly prefer the current cruciform-trigger design owing to its decades-earned reputation of safety and reliability will be enthusiastic

[1] HB5043 also amends the definition of "machine gun" in §53-202(a) so that it "includ[es] any convertible pistol that is equipped with a pistol converter." Ex.A at 1. Plaintiffs do not challenge this aspect of HB5043.

about switching to an alternative. Nor is there any guarantee, even if manufacturers' investment in developing a commercially viable alternative pays off, that Connecticut will not amend HB5043 to ban that handgun next. At bottom, no amount of design alteration can ever make a handgun impervious to criminal misuse, or change the reality that "virtually any semiautomatic weapon may be converted" "into a machinegun" by someone set on committing that crime. *Staples*, 511 U.S. at 615. The same (il)logic underlying HB5043 thus could be invoked to ban semiautomatic firearms entirely.

**III. Banning Sales Of Guns In Common Used For Lawful Purposes Is Inconsistent With Historical Tradition And Therefore Violates The Second Amendment.**

49. The Supreme Court has held multiple times that states may not ban arms that "law-abiding citizens" "typically possess[] … for lawful purposes." *Heller*, 554 U.S. at 625, *accord Bruen*, 597 U.S. at 21 ("[T]he Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"). That describes HB5043 to a T: In purpose and effect, it is designed to "eliminat[e] the ability of law-abiding, responsible citizens to acquire" the single most common class of handguns—indeed, one of the most common firearms—on the market. *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) (per curiam) (holding that "commercial regulations on firearms dealers, whose services are necessary to a citizen's effective exercise of Second Amendment rights, cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms"); *see* Statement of Governor Ned Lamont, *supra*.

50. Whatever room for debate there may be about what exactly suffices to render a class of firearms in common use, there can be no serious dispute that cruciform-trigger handguns are typically possessed by a substantial number of law-abiding citizens for self-defense, both inside and outside Connecticut. That makes HB5043 unconstitutional, full stop. When it comes to what "Arms" "the people" have a "right" "to keep and bear," U.S. Const. amend. II, common use *is* the

controlling test—and HB5043 flunks it.

51. That these ubiquitous semiautomatic handguns can be converted into fully automatic firearms does not change the calculus. Modern firearm restrictions are permissible only if they are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. And for as long as firearms have existed, criminals unfortunately have attempted dangerous firearm conversions. Yet HB5043's response to that age-old problem departs starkly from the traditional way our Nation has dealt with that problem—which is by banning the conversion, not the convertible firearm.

52. For instance, criminals have always been able to convert common firearms into dangerous and unusual booby traps. The tradition at the Founding was to criminalize these so-called trap guns but to leave the unmodified gun legal to purchase and possess. *See, e.g.*, 1771 N.J. Laws 346, §10. That remained the tradition when the states ratified the Fourteenth Amendment. *See, e.g.*, 1884 Vt. Acts & Resolves 74, §1. And it remains the tradition today. *See, e.g.*, 21 U.S.C. §841(d).

53. Criminals have likewise always been able to convert long guns commonly used for hunting and other lawful purposes into illegal short-barreled rifles and shotguns. But here, too, the unbroken tradition has been to criminalize the sawed-off variants (and prosecute those doing the sawing) but leave the unmodified rifles and shotguns lawful to purchase and possess. *See, e.g.*, 18 U.S.C. §922(a)(4), (b)(4); Conn. Gen. Stat. §53a-211.

54. More recently, criminals have devised no shortage of ways to turn common semiautomatic arms into illegal machine guns, from "fil[ing] away" internal safeguards (as in *Staples*, 511 U.S. at 603) to simply tying a shoelace "to the cocking handle of a semiautomatic rifle" (as described in, *e.g.*, Letter from Richard Vasquez, Acting Chief, Firearms Technology

Branch, ATF, to Brian A. Blakely (June 25, 2007), https://perma.cc/22Q7-7C94). Once again, the modern response reflects the Founding-era tradition: ban the modification and the modified firearm, but leave the unmodified firearm legal to purchase and possess.

55. Indeed, the history is so one-sided that Plaintiffs would prevail even if they bore the burden to prove that HB5043 is *not* consistent with historical tradition, *contra Bruen*, 597 U.S. at 24. The potential for dangerous firearms conversions has always been an unfortunate byproduct of widespread firearm availability, and it was a potential well known to the Founding generation. Yet that generation chose to ratify the Second Amendment regardless—"the very *product* of an interest balancing by the people" that "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at 26. It is not for Connecticut to "conduct" that balancing "anew" today. *Heller*, 554 U.S. at 635.

**CLAIM FOR RELIEF**

**Violation of U.S. Constitution, Second Amendment**
**42 U.S.C. §1983**

56. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set out herein.

57. The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

58. As relevant here, HB5043 defines "convertible pistols" as "any semiautomatic pistol with a cruciform trigger bar that can be readily altered by hand or with a common household tool so that the pistol can be readily converted into a machine gun by the installation or attachment of a pistol converter." Ex.A at 2. HB5043 defines "machine gun" in principal part as "a weapon of any description, loaded or unloaded, … that shoots, is designed to shoot or can be readily restored to shoot automatically more than one projectile, without manual reloading, by a single

function of the trigger." Ex.A at 1. HB5043 defines "pistol converter" as "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, interferes with the trigger mechanism, thereby enabling the pistol to discharge a number of shots or bullets rapidly or automatically with one continuous pull of the trigger." Ex.A at 3.

59. So defined, "convertible pistols" are "Arms" covered by the Second Amendment.

60. So defined, "convertible pistols" are in common use for self-defense, hunting, target shooting, and other lawful purposes.

61. Because HB5043 bans the commercial sales of arms in common use for lawful purposes, it violates the Second Amendment. *See Gazzola*, 88 F.4th at 195-96 ("A State cannot circumvent [the Second Amendment] by banning outright the sale or transfer of common-use weapons and necessary ammunition.").

62. Shadow Systems and other NSSF members have long been manufacturing handguns that HB5043 bans; Blue Trail Range and other NSSF members have long been selling them; all would like to continue to engage in that presently lawful conduct. And the customers that Shadow Systems, Blue Trail Range, and other NSSF members would like to continue to be able to lawfully serve are among "the people" the Second Amendment protects.

63. NSSF, Shadow Systems, and Blue Trail Range therefore have standing to challenge HB5043, both in their own right and on behalf of those members and customers. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *Knight v. City of New York*, 164 F.4th 173, 177-79 (2d Cir. 2026) (per curiam); *Gazzola*, 88 F.4th at 194 (having "no trouble concluding that" "purveyors of firearms" can "resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market."); *Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) ("Either" an organization "can

claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'"). Among other things, if HB5043 is permitted to take effect, NSSF will be forced to divert resources away from other initiatives—including the "Right Side of Legal" campaign described *supra* ¶9—and devote significant resources to educating and supporting its members in efforts to comply with HB5043. Compounding the problem, if HB5043 is permitted to take effect, NSSF also anticipates a reduction in receivable NSSF membership dues.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants and provide the following relief:

1. an order declaring that the challenged portions of HB5043 violate the Second Amendment both on their face and as applied to cruciform-trigger handguns manufactured by Shadow Systems, cruciform-trigger handguns sold by Blue Trail Range, and cruciform-trigger handguns manufactured and/or sold by other NSSF members;

2. an order temporarily, preliminarily, and permanently enjoining Defendants without bond from implementing and enforcing the challenged portions of HB5043;

3. an award of costs and attorneys' fees pursuant to 42 U.S.C. §1988 and any other applicable statute or authority; and

4. any further relief the Court deems just and appropriate.

PLAINTIFFS – NATIONAL SHOOTING SPORTS FOUNDATION, INC., SHADOW SYSTEMS LLC, AND BLUE TRAIL RANGE CORPORATION

By /s/ Jennifer L. Morgan

Jennifer L. Morgan – ct21751
jmorgan@harrisbeachmurtha.com
Julie A. Lavoie – ct31241
jlavoie@harrisbeachmurtha.com
HARRIS BEACH MURTHA CULLINA PLLC
265 Church Street, 9th Floor
New Haven, CT 06510
Telephone: 203.772.7700
Facsimile: 203.772.7723

Erin E. Murphy (pro hac vice)
Matthew D. Rowen (pro hac vice)
Kevin Wynosky (pro hac vice)
Ilan J. Posner (pro hac vice)
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
Telephone: (202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com
ilan.posner@clementmurphy.com

Their Attorneys

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Salam Fatohi declares as follows:

1. I am the Director of Research at the National Shooting Sports Foundation.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2026

By: /s/ Salam Fatohi
Salam Fatohi

**VERIFICATION OF COMPLAINT**

Pursuant to 28 U.S.C. §1746, Richard T.S. Roe declares as follows:

4. I am the Chief Operating Officer of Shadow Systems LLC.

5. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

6. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2026

By: /s/ Richard T.S. Roe
Richard T.S. Roe

**VERIFICATION OF COMPLAINT**

Pursuant to 28 U.S.C. §1746, Deborah Woessner Lyman declares as follows:

1. I am the Owner, President, and Treasurer of Blue Trail Range.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2026

By: /s/ Deborah Woessner Lyman
Deborah Woessner Lyman

# EXHIBIT A

# EXHIBIT A

***Substitute House Bill No. 5043***

## ***Public Act No. 26-41***

***AN ACT CONCERNING CONVERTIBLE PISTOLS, UNFINISHED FRAMES OR UNFINISHED LOWER RECEIVERS, VOLUNTARY RELINQUISHMENT OF FIREARMS AND AMMUNITION, AND REFUNDABILITY OF PERMITS FOR SALE AT RETAIL OF FIREARMS AND FOR CARRYING OF PISTOLS AND REVOLVERS.***

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. Subsection (a) of section 53-202 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2026*):

(a) As used in this section: (1) "Machine gun" [shall apply to and include] means (A) a weapon of any description, loaded or unloaded, [which] that shoots, is designed to shoot or can be readily restored to shoot automatically more than one projectile, without manual reloading, by a single function of the trigger, including any convertible pistol that is equipped with a pistol converter, as defined in subsection (c) of section 53-206g, as amended by this act, and [shall also include] (B) any part or combination of parts designed for use in converting a weapon into a machine gun and any combination of parts from which a machine gun can be assembled if such parts are in the possession of or under the control of a person. (2) "Crime of violence" [shall apply to and include] means any of the following-named crimes or an attempt to commit any of the same: Murder, manslaughter, kidnapping, sexual

assault and sexual assault with a firearm, assault in the first or second degree, robbery, burglary, larceny and riot in the first degree. (3) "Projectile" means any size bullet that when affixed to any cartridge case may be propelled through the bore of a machine gun. (4) "Convertible pistol" means any semiautomatic pistol with a cruciform trigger bar that can be readily altered by hand or with a common household tool so that the pistol can be readily converted into a machine gun by the installation or attachment of a pistol converter, as defined in subsection (c) of section 53-206g, as amended by this act. "Convertible pistol" does not include (A) any hammer-fired semiautomatic pistol, or (B) any semiautomatic pistol with a cruciform trigger bar that has a tab or other piece of material molded to the pistol's frame that shields the cruciform trigger bar from interference by a pistol converter, unless the tab or other piece of material can be readily removed from the pistol's frame. (5) "Cruciform trigger bar" means a component in a semiautomatic pistol that serves as a linkage between the trigger and firing pin and has its sear incorporated in a cross-shaped surface. (6) "Common household tool" includes, but is not limited to, a knife, screwdriver, wrench, hacksaw, crowbar, electric drill, rotary tool, hammer, chisel, file or pliers.

Sec. 2. Subsection (c) of section 53-206g of the 2026 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2026*):

(c) For purposes of this section, (1) "firearm" means firearm as defined in section 53a-3, as amended by this act, **[**and**]** (2) "rate of fire enhancement" means (A) any device, component, part, combination of parts, attachment or accessory that: **[**(1)**]** (i) Uses energy from the recoil of a firearm to generate a reciprocating action that causes repeated function of the trigger, including, but not limited to, a bump stock; **[**(2)**]** (ii) repeatedly pulls or forcibly resets the trigger of a firearm through the use of a crank, lever or other part, including, but not limited to, a trigger

crank or forced reset trigger; or **[**(3)**]** (iii) causes a semiautomatic firearm to fire more than one round per operation of the trigger, where the trigger pull and reset constitute a single operation of the trigger, including, but not limited to, a binary trigger system or a pistol converter, or (B) any other device, part, combination of parts, kit, tool or accessory that is not necessary for the function of the pistol and that, when built into, installed in or attached to the pistol, increases the rate of fire above the rate at which a person can fire the firearm without the device, part, combination of parts, kit, tool or accessory, and (3) "pistol converter" means any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, interferes with the trigger mechanism, thereby enabling the pistol to discharge a number of shots or bullets rapidly or automatically with one continuous pull of the trigger.

Sec. 3. (NEW) (*Effective October 1, 2026*) (a) Any individual or firm, partnership, corporation, limited liability company, association or other similar entity that knowingly imports into this state or knowingly advertises, sells, offers or exposes for sale any convertible pistol, as defined in section 53-202 of the general statutes, as amended by this act, that was manufactured on or after October 1, 2026, shall be guilty of a class D felony.

(b) The provisions of this section shall not apply to sale at retail or other lawful transfer of a convertible pistol by a person who is not a licensed gun dealer to another person who is not a licensed gun dealer.

Sec. 4. Section 53a-3 of the 2026 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2026*):

Except where different meanings are expressly specified, the following terms have the following meanings when used in this title:

(1) "Person" means a human being, and, where appropriate, a public or private corporation, a limited liability company, an unincorporated association, a partnership, a government or a governmental instrumentality;

(2) "Possess" means to have physical possession or otherwise to exercise dominion or control over tangible property;

(3) "Physical injury" means impairment of physical condition or pain;

(4) "Serious physical injury" means physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ;

(5) "Deadly physical force" means physical force which can be reasonably expected to cause death or serious physical injury;

(6) "Deadly weapon" means any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. The definition of "deadly weapon" in this subdivision shall be deemed not to apply to section 29-38 or 53-206 and does not include an electronic defense weapon when used by a peace officer;

(7) "Dangerous instrument" means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury, and includes a "vehicle" as that term is defined in this section and includes a dog that has been commanded to attack, except a dog owned by a law enforcement agency of the state or any political subdivision thereof or of the federal government when such dog is in the performance of its duties under the direct supervision, care and control of an assigned law enforcement officer;

(8) "Vehicle" means a "motor vehicle" as defined in section 14-1, a snowmobile, any aircraft, or any vessel equipped for propulsion by mechanical means or sail;

(9) "Peace officer" means a member of the Division of State Police within the Department of Emergency Services and Public Protection or an organized local police department, a chief inspector or inspector in the Division of Criminal Justice, a state marshal while exercising authority granted under any provision of the general statutes, a judicial marshal in the performance of the duties of a judicial marshal, a conservation officer or special conservation officer, as defined in section 26-5, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, 29-18a, 29-18b or 29-19, an adult probation officer, an official of the Department of Correction authorized by the Commissioner of Correction to make arrests in a correctional institution or facility, any investigator in the investigations unit of the office of the State Treasurer, an inspector of motor vehicles in the Department of Motor Vehicles, who is certified under the provisions of sections 7-294a to 7-294e, inclusive, a United States marshal or deputy marshal, any special agent of the federal government authorized to enforce the provisions of Title 21 of the United States Code, or a member of a law enforcement unit of the Mashantucket Pequot Tribe or the Mohegan Tribe of Indians of Connecticut created and governed by a memorandum of agreement under section 47-65c who is certified as a police officer by the Police Officer Standards and Training Council pursuant to sections 7-294a to 7-294e, inclusive;

(10) "Firefighter" means any agent of a municipality whose duty it is to protect life and property therein as a member of a duly constituted fire department whether professional or volunteer;

(11) A person acts "intentionally" with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct;

(12) A person acts "knowingly" with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists;

(13) A person acts "recklessly" with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation;

(14) A person acts with "criminal negligence" with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation;

(15) "Machine gun" means a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a submachine gun and any convertible pistol, as defined in section 53-202, as amended by this act, that is in the possession of an individual person who is also in the possession of a pistol converter, as defined in subsection (c) of section 53-206g, as amended by this act;

(16) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger;

(17) "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger;

(18) "Pistol" or "revolver" means any firearm having a barrel less than twelve inches;

(19) "Firearm" means any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged;

(20) "Electronic defense weapon" means a weapon which by electronic impulse or current is capable of immobilizing a person temporarily, including a stun gun or other conductive energy device;

(21) "Martial arts weapon" means a nunchaku, kama, kasari-fundo, octagon sai, tonfa or chinese star;

(22) "Employee of an emergency medical service organization" means an ambulance driver, emergency medical technician or paramedic as defined in section 19a-175;

(23) "Railroad property" means all tangible property owned, leased or operated by a railroad carrier including, but not limited to, a right-of-way, track, roadbed, bridge, yard, shop, station, tunnel, viaduct, trestle, depot, warehouse, terminal or any other structure or appurtenance or equipment owned, leased or used in the operation of a railroad carrier including a train, locomotive, engine, railroad car, signals or safety device or work equipment or rolling stock;

(24) "Serious firearm offense" means a violation of section 29-36, 29-36a, as amended by this act, or 53-202w, possession of a stolen firearm or a firearm that is altered in a manner that renders the firearm

unlawful, or any crime of which an essential element is that the person discharged, used or was armed with and threatened the use of a firearm; and

(25) "Serious firearm offender" means a person who has (A) two convictions for a serious firearm offense, (B) a conviction for a serious firearm offense and was previously convicted of a violation of section 29-36, 29-36a, as amended by this act, subdivision (1) of subsection (a) of section 53a-217 or subdivision (1) of subsection (a) of section 53a-217c, or (C) a conviction for a serious firearm offense and was previously convicted of two or more additional felony offenses.

Sec. 5. Section 53-206j of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2026*):

(a) No person shall purchase or receive or sell, deliver or otherwise transfer an unfinished frame or unfinished lower receiver, except as provided in: (1) Subsections (b) and (c) of this section; or (2) subsection (d) of this section; or (3) subsection (e) of this section.

(b) The procedures for the purchase or receipt or sale, delivery or other transfer of an unfinished frame or unfinished lower receiver shall be the same procedures as apply to the purchase or receipt or sale, delivery or other transfer of a pistol or revolver under subsections (b) to (e), inclusive, of section 29-33, provided such purchase or receipt or sale, delivery or other transfer of an unfinished frame or unfinished lower receiver is in accordance with the provisions of subsection (c) of this section.

(c) (1) No person shall sell, deliver or otherwise transfer an unfinished frame or unfinished lower receiver pursuant to subsection (b) of this section that does not have a unique serial number or other mark of identification, obtained pursuant to: (A) The serial numbering program of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives, or

(B) subdivisions (2) and (3) of this subsection.

(2) A person may obtain a unique serial number or other mark of identification for an unfinished frame or unfinished lower receiver by providing to the Department of Emergency Services and Public Protection any identifying information concerning the unfinished frame or unfinished lower receiver and the owner of such unfinished frame or unfinished lower receiver, in a manner prescribed by the Commissioner of Emergency Services and Public Protection. Upon receiving a properly submitted request for a unique serial number or other mark of identification for an unfinished frame or unfinished lower receiver, the Department of Emergency Services and Public Protection shall determine if such person is prohibited from purchasing a firearm, and if not, shall issue to such person a unique serial number or other mark of identification immediately and in no instance more than (A) three business days after the Department of Emergency Services and Public Protection receives such request, or (B) ten business days after the system to distribute a unique serial number or other mark of identification pursuant to section 29-36b, as amended by this act, is operational, whichever date is later.

(3) Such unique serial number or other mark of identification shall be engraved upon or permanently affixed to the unfinished frame or unfinished lower receiver in a manner that conforms with the requirements imposed on licensed importers and licensed manufacturers of firearms pursuant to 18 USC 923(i), as amended from time to time, and any regulation adopted thereunder.

(d) The provisions of subsections (a) to (c), inclusive, of this section shall not apply to the sale, delivery or transfer of any unfinished frame or unfinished lower receiver between (1) a federally licensed firearm manufacturer and a federally licensed firearm dealer, (2) a federally licensed firearm importer and a federally licensed firearm dealer, or (3) federally licensed firearm dealers.

(e) Any person may arrange in advance to deliver and transfer an unfinished frame or unfinished lower receiver to a police department or the Department of Emergency Services and Public Protection.

(f) On and after October 1, 2019, no person shall possess an unfinished frame or unfinished lower receiver unless such person is eligible to purchase a firearm under state and federal law.

(g) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, the court may order suspension of prosecution. The court shall not order suspension of prosecution unless the accused person has acknowledged that he or she understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the tolling of any statute of limitations with respect to such violation and to a waiver of his or her right to a speedy trial. Such person shall appear in court and shall be released to the supervision of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes such person's period of probation, he or she may apply for dismissal of the charges against such person and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against such person after satisfactorily completing such person's period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed such person's period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal,

all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed such person's period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal.

(h) Any person who violates any provision of this section shall be guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, except that any person who sells, delivers or otherwise transfers an unfinished frame or unfinished lower receiver in violation of the provisions of this section knowing that such unfinished frame or unfinished lower receiver is stolen or that the manufacturer's number or other mark of identification on such unfinished frame or unfinished lower receiver has been altered, removed or obliterated, shall be guilty of a class B felony for which three years of the sentence imposed may not be suspended or reduced by the court, and ten thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, and any unfinished frame or unfinished lower receiver found in the possession of any person in violation of any provision of this section shall be forfeited.

(i) For purposes of this section, ["unfinished frame or lower receiver"] "unfinished frame or unfinished lower receiver" means a blank, casting, [or machined body intended to be turned into the frame or lower receiver of a firearm, as defined in section 53a-3, with additional machining, and which has been formed or machined to the point where most major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm, even if the fire-control cavity area of such blank, casting or

machined body is still completely solid and unmachined. An "unfinished frame or lower receiver" is not a firearm, as defined in 18 USC 921(a), as amended from time to time**]** forging, printing, extrusion, machined body or similar item that (1) has reached a stage in manufacture where it may readily be completed into the frame or receiver of a functional firearm; or (2) is marketed or sold to the public to become or be used as the frame or receiver of a functional firearm once completed.

Sec. 6. Subsection (b) of section 29-28 of the 2026 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2026*):

(b) (1) No person who sells ten or more firearms in a calendar year or is a federally licensed firearm dealer shall advertise, sell, deliver, or offer or expose for sale or delivery, or have in such person's possession with intent to sell or deliver, any pistol or revolver at retail without having a permit therefor issued as provided in this subsection. No individual or firm, partnership, corporation, limited liability company, association or other similar entity may within this state advertise, sell, deliver or offer or expose for sale or delivery, or have in such individual's or firm's, partnership's, corporation's, limited liability company's, association's or other similar entity's possession with the intent to sell at retail or deliver, any unfinished frame or unfinished lower receiver, as defined in section 53-206j, as amended by this act, without having a permit therefor issued as provided in this subsection.

(2) The local permitting authority may, upon the application of any person, issue a permit in such form as may be prescribed by the Commissioner of Emergency Services and Public Protection for the sale at retail of firearms within the jurisdiction of the local permitting authority. No permit for the sale at retail of firearms shall be issued unless the applicant holds a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f or a valid state permit to carry

a pistol or revolver issued pursuant to subsection (c) of this section; and the applicant submits documentation sufficient to establish that local zoning requirements have been met for the location where the sale is to take place, except that any person selling or exchanging a pistol or revolver for the enhancement of a personal collection or for a hobby or who sells all or part of such person's personal collection of pistols or revolvers shall not be required to submit such documentation for the location where the sale or exchange is to take place.

(3) Any person holding a valid permit for the sale at retail of pistols or revolvers issued on or before September 30, 2023, shall be deemed to be a holder of a valid permit for the sale at retail of firearms until such permit for the sale at retail of pistols or revolvers expires or is revoked, suspended, confiscated or surrendered. The holder of such permit may renew such permit as a permit for the sale at retail of firearms pursuant to section 29-30, as amended by this act.

Sec. 7. Subdivision (2) of section 52-571o of the 2026 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2026*):

(2) "Firearm industry product" means any of the following which are or were (A) sold, made or distributed in this state; or (B) possessed in this state and it was known by the firearm industry member that such product would be sold, made, distributed or possessed in this state:

(i) Ammunition or a magazine as those terms are defined in section 29-38m;

(ii) A firearm as defined in section 53a-3, as amended by this act;

(iii) An unfinished frame or unfinished lower receiver as defined in section 53-206j, as amended by this act; or

(iv) A rate of [firearm] fire enhancement as defined in section 53-206g,

as amended by this act.

Sec. 8. Subsection (d) of section 29-36a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2026*):

(d) The provisions of subsections (a), (b) and (c) of this section shall not apply to the manufacture of a firearm manufactured using an unfinished frame or unfinished lower receiver, as defined in section 53-206j, as amended by this act, on which a serial number or other mark has been engraved or permanently affixed pursuant to subsection (c) of section 53-206j, as amended by this act.

Sec. 9. Section 29-36b of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2026*):

Not later than October 1, 2019, the Department of Emergency Services and Public Protection, in consultation with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives as needed, shall develop and maintain a system to distribute a unique serial number or other mark of identification to any person requesting such number or mark pursuant to section 29-36a or 53-206j, as amended by this act, and provide written notification that such system is operational by: (1) Posting the notification on the department's Internet web site, and (2) providing the notification electronically to federally licensed firearm dealers. The department shall maintain identifying information of the person requesting the number or mark and of the firearm or unfinished frame or unfinished lower receiver, as defined in section 53-206j, as amended by this act, for which each such number or mark is requested.

Sec. 10. (NEW) (*Effective October 1, 2026*) (a) Any individual may, at any time, deliver or surrender any firearm, as defined in section 53a-3 of the general statutes, as amended by this act, or ammunition in the possession of such individual to the Commissioner of Emergency

Services and Public Protection for a period of not less than fourteen days, provided a local police department may accept such firearm or ammunition on behalf of said commissioner. The commissioner or local police department shall exercise due care in the receipt and holding of such firearm or ammunition.

(b) An individual who delivers or surrenders a firearm or ammunition to the Commissioner of Emergency Services and Public Protection or a local police department may request the return of such firearm or ammunition on or after the fifteenth day after the date of such delivery or surrender, but not later than two years after such date. Such request shall include a completed and signed form promulgated pursuant to subsection (b) of section 11 of this act.

(c) Not later than five days after receiving a request pursuant to subsection (b) of this section, the commissioner or a local police department shall review the request and make available for retrieval any firearm or ammunition to such individual, provided the commissioner or local police department confirms that such individual (1) submitted the signed form required pursuant to subsection (b) of this section, (2) is not otherwise disqualified from possessing such firearm or ammunition, and (3) was legally entitled to possess such firearm or ammunition at the time of delivery or surrender to the commissioner or a local police department. If such firearm or ammunition has not been collected by the individual at the end of the two-year period immediately following the date of delivery or surrender of such firearm or ammunition, the commissioner or a local police department, as applicable, shall cause such firearm or ammunition to be destroyed. Not later than ninety days prior to such destruction, the commissioner or local police department, as applicable, shall notify, in writing, the individual who delivered or surrendered the firearm or ammunition of the date of such destruction.

Sec. 11. (NEW) (*Effective from passage*) (a) Not later than thirty days

after the effective date of this section, the Commissioner of Emergency Services and Public Protection shall, within available appropriations, provide written notification of the provisions of section 10 of this act by posting the notification on the Department of Emergency Services and Public Protection's Internet web site. Such notification shall include directions concerning how an individual who delivers or surrenders any firearm, as defined in section 53a-3 of the general statutes, as amended by this act, or ammunition in the possession of such individual to the Commissioner of Emergency Services and Public Protection for a period of not less than fourteen days, may on or after the fifteenth day after the date of such delivery or surrender, but not later than two years after such date, request the return of such firearm or ammunition, and which requirements the individual must satisfy in order to have such firearm or ammunition returned to such person. Such notice shall also provide that such firearm or ammunition shall be destroyed if not collected by the individual before the end of the two-year period immediately following the date of delivery or surrender of a firearm or ammunition.

(b) On or before October 1, 2027, the Commissioner of Emergency Services and Public Protection shall promulgate and make available on the Department of Emergency Services and Public Protection's Internet web site a form to be signed by any individual who is seeking the return of a firearm or ammunition pursuant to section 10 of this act.

Sec. 12. Subsections (a) to (e), inclusive, of section 29-30 of the 2026 supplement to the general statutes are repealed and the following is substituted in lieu thereof (*Effective October 1, 2026*):

(a) The fee for each permit originally issued under the provisions of subsection (b) of section 29-28, as amended by this act, for the sale at retail of firearms shall be two hundred dollars and the fee for each renewal of such permit shall be two hundred dollars. The fee for each state permit originally issued under the provisions of subsection (c) of

section 29-28, for the carrying of pistols and revolvers shall be one hundred forty dollars plus sufficient funds as required to be transmitted to the Federal Bureau of Investigation to cover the cost of a national criminal history records check. The local permitting authority, as defined in section 29-28, as amended by this act, or the chief of police of a law enforcement unit of any federally recognized Native American tribe within the borders of the state, as referenced in subsection (c) of section 29-28, shall forward sufficient funds for the national criminal history records check to the commissioner no later than five business days after receipt by the local permitting authority, or such chief of police of a law enforcement unit of any federally recognized Native American tribe, of the application for the temporary state permit. **[**Seventy**]** Except as provided in subsection (e) of this section, seventy dollars shall be retained by the local permitting authority, or such chief of police of a law enforcement unit of any federally recognized Native American tribe. Upon approval by the local permitting authority, or such chief of police of a law enforcement unit of any federally recognized Native American tribe, of the application for a temporary state permit, seventy dollars shall be sent to the commissioner. The fee to renew each state permit originally issued under the provisions of subsection (c) of section 29-28 shall be seventy dollars. Upon deposit of such fees in the General Fund, ten dollars of each fee shall be credited within thirty days to the appropriation for the Department of Emergency Services and Public Protection to a separate nonlapsing account for the purposes of the issuance of permits under subsections (b) and (c) of section 29-28, as amended by this act.

(b) A local permit originally issued before October 1, 2001, whether for the sale at retail of pistols and revolvers or for the carrying of pistols and revolvers, shall expire five years after the date it becomes effective and each renewal of such permit shall expire five years after the expiration date of the permit being renewed. On and after October 1, 2001, no local permit for the carrying of pistols and revolvers shall be

renewed.

(c) A state permit originally issued under the provisions of section 29-28, as amended by this act, for the carrying of pistols and revolvers shall expire five years after the date such permit becomes effective and each renewal of such permit shall expire five years after the expiration date of the state permit being renewed and such renewal shall not be contingent on the renewal or issuance of a local permit. A temporary state permit issued for the carrying of pistols and revolvers shall expire sixty days after the date it becomes effective, and may not be renewed.

(d) The renewal fee required pursuant to subsection (a) of this section shall apply for each renewal which is requested not earlier than thirty-one days before, and not later than thirty-one days after, the expiration date of the state permit being renewed.

(e) No fee or portion of any fee paid under the provisions of this section for issuance or renewal of a state permit shall be refundable except if (1) such permit for which the fee or portion was paid was not issued or renewed, or (2) the local permitting authority fails to discharge any obligation applicable to such local permitting authority pursuant to subdivision (1) of subsection (b) of section 29-28a or subsection (b) or (c) of section 29-29 within the applicable time limits established under said subdivision or subsections, in which case the local permitting authority shall refund seventy dollars to the applicant. A refund issued pursuant to the provisions of subdivision (2) of this subsection shall not alleviate the local permitting authority from discharging any obligation specified in said subdivision or subsections after such applicable time limits. The portion of the fee expended on the national criminal history records check for any such permit that was not issued or renewed shall not be refunded.

***Substitute House Bill No. 5043***

Governor's Action:
Approved May 26, 2026